

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-6-2005

# Wright v. Philadelphia

Precedential or Non-Precedential: Precedential

Docket No. 03-1633

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Wright v. Philadelphia" (2005). *2005 Decisions.* Paper 929.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/929

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-1633

———

KIMBERLY MARNELL WRIGHT

v.

CITY OF PHILADELPHIA; DANIEL HEENEY, DETECTIVE,
BADGE NUMBER 650; DOE(S), POLICE OFFICER,
INDIVIDUALLY AND AS POLICE OFFICERS AND
DETECTIVES FOR THE CITY OF PHILADELPHIA; DENISE
O'MALLEY, POLICE OFFICER, BADGE NUMBER 4335

DANIEL HEENEY; DENISE O'MALLEY,

Apellants.

———

On Appeal from the United States District Court
for the United States District Court for the Eastern District of
Pennsylvania
(D.C. No. 01-cv-6160)
District Judge: Honorable Norma L. Shapiro

———

Argued September 27, 2004
Before: RENDELL, FUENTES, and SMITH, <u>Circuit Judges</u>.

(Filed June 6, 2005)

———

Richard Feder
Craig Gottlieb (Argued)
City Solicitor
1515 Arch Street, 17th Floor

Philadelphia, PA 19102

ATTORNEYS FOR APPELLANTS

Paul Messing (Argued)
Kairys, Rudovsky, Epstein, Messing
924 Cherry Street, Suite 500
Philadelphia, PA 19107

ATTORNEY FOR APPELLEE

OPINION OF THE COURT

———

FUENTES, Circuit Judge.

After Kimberly Wright was sexually assaulted by two men, she broke a window and entered the house in which the assault took place for the purpose of retrieving her clothes. Following two separate investigations, conducted by the defendant officers concerning the sexual assault and the break-in, Wright was charged with burglary, theft, criminal trespass, and criminal mischief. The charges against Wright were eventually dismissed. Thereafter, she filed a § 1983 action against the defendant officers alleging that they violated her constitutional rights. The District Court denied the officers' motion for summary judgment on the issue of qualified immunity and the defendants now appeal. Because the facts and circumstances within the arresting officers' knowledge

2

were sufficient to warrant a prudent person believing that Wright had committed the crime of criminal trespass, we conclude that there was no constitutional violation. Therefore, we hold that the officers were entitled to qualified immunity and we will reverse denial of the officers' motion for summary judgment.

## I. Facts

### A. The Assault

Wright's action arises from two separate police investigations, one for a sexual assault and one for a reported breaking and entry.[1] On the morning of December 16, 1999, Wright was driving alone on Chelten Avenue in Philadelphia when her car broke down. Two men, Ronald Jackson and Nimar Thompson, stopped and offered Wright assistance. Instead of helping her, they drugged her and forcibly took her to a beauty parlor owned by Jackson. Soon thereafter, Jackson and Thompson took Wright from the beauty parlor to a home on Cedar Park Avenue where she was held in an intoxicated state for several

---

[1] Because we are reviewing a claim of qualified immunity, we view the factual allegations in the light most favorable to Wright, the party claiming injury. See Saucier v. Katz, 533 U.S. 194, 201 (2001).

3

hours. When she awoke, she was partially undressed. She believed that she had been sexually assaulted. Eventually, the two men forced Wright out of the house, leaving her on the front porch. Wright knocked on several neighbors' doors for help, but received no response. She then returned to the house where she had been assaulted, broke a small window pane and reentered the property. Once inside, Wright retrieved her personal belongings, as well as three plastic bags containing several items such as: a photograph of one of her attackers, several pieces of mail, two cancelled checks made out to Jackson, unopened bottles of alcohol, watches, a jacket, clothes, and a cordless phone. Wright later told police that she took these items to help identify her attackers.

After leaving the Cedar Park home with the items, Wright was able to get a ride from a taxi to a friend's home. The following day, Wright's sister took her to the hospital where she was treated for her physical injuries. At the hospital, Wright was interviewed by Officer Manning to whom she described the circumstances of the attack and explained that she had broken a window to get back inside the residence to retrieve her clothes. Sometime during her hospital stay, she was treated and examined for sexual assault.

4

Specimens were taken for the purpose of collecting any DNA evidence that may have been left on her body by her attackers.

Meanwhile, Jackson's sister Denise Pue, the owner of the Cedar Park home where the assault occurred, reported the break-in of her home. There were thus two criminal investigations initiated by the Philadelphia Police Department: one related to Wright's sexual assault that was to be investigated by Officer Denise O'Malley and one related to Pue's allegations of a break-in that was to be investigated by Detective Daniel Heeney.

**B. The Investigations**

The investigation of the sexual assault began on December 17, 1999, when O'Malley first interviewed Wright. In the interview, Wright described the circumstances of the assault and said that she had broken the window to get back into the house to get her clothes. On December 19, the police, accompanied by Wright and her mother, proceeded to locate the house where she had been assaulted. After locating the house, Wright's mother told police that Wright had removed property from the house to prove that she had been there. Thereafter, Wright gave police the three bags of items taken from Pue's house. The items were later

5

released to Pue.

Meanwhile, the burglary investigation had begun on December 16 when Heeney went to the Cedar Park home to examine the scene of the break-in. Pue told Heeney during an interview that she learned from a neighbor that her brother, Jackson, had brought a woman to the house while she was at work. During the investigation, Heeney discovered a broken pane of glass by the front door and he recovered a slip of paper with the name "Kimberly Wright" on it. The following day, Heeney interviewed Jackson. Jackson admitted that he brought Wright to his sister's house, but he claimed that she was extremely intoxicated and that she refused to go when he told her to leave. Jackson denied having sexual intercourse with Wright and told Heeney that he and a friend had left the house after calling the police because she refused to leave.

The two police investigators, O'Malley and Heeney, disagree as to when each first became aware of the other's investigation. O'Malley remembers December 19 as the day on which she received facsimiles of Pue's burglary complaint from Heeney's office. Heeney, however, documented in his report,

dated December 17, 1999, that O'Malley had related to him a summary of Wright's allegations. The officers spoke on a few occasions throughout their respective investigations.

On January 24, 2000, O'Malley determined that Wright's sexual assault complaint was unfounded and told Heeney that the case did not have a sufficient foundation to proceed. At some unknown date, but prior to O'Malley closing the sexual assault case, Heeney prepared an affidavit of probable cause for Wright's arrest in regard to the burglary of Pue's residence. His affidavit was approved by an Assistant District Attorney on January 30, 2000.

On February 8, 2000, Heeney arrested Wright without a warrant for a number of offenses, including burglary, theft, and criminal trespass. The arrest report lists both Heeney and O'Malley as the police personnel involved. Nearly two months after her arrest, the charges against Wright were dismissed for failure to prosecute because Pue failed to appear at the preliminary hearing.

Shortly after the dismissal of the charges against Wright, Philadelphia police authorities reopened a number of sexual assault investigations, including Wright's case. The cases were reopened

following complaints made by victims, the Women's Law Project, and other advocacy groups concerning the manner in which Philadelphia police officers were handling sexual assault cases. After the case was reopened, DNA samples confirmed that Jackson was the source of the semen found in the rape exam that was performed on Wright. Within three months after Wright's case was reopened, Jackson and Thompson were arrested and charged with the sexual assault on Wright. Both men later pled guilty and were sentenced to periods of incarceration. In November 2001, the Philadelphia Police Internal Affairs Division issued a report finding that O'Malley had "conducted a less than proper/thorough investigation" of Wright's assault case and that her case should not have been closed as unfounded.

After her case was reopened and Jackson and Thompson were arrested, Wright filed the present § 1983 action in the District Court against the City of Philadelphia and the officers for violating her First, Fourth, and Fourteenth Amendment rights. She specifically claimed that she was falsely arrested and maliciously prosecuted by Heeney and O'Malley. Wright moved for summary judgment on a number of issues, including that the defendants were

8

not entitled to qualified immunity. The defendants opposed Wright's motion for summary judgment, and independently moved for summary judgment on two issues, including that O'Malley and Heeney were entitled to qualified immunity. The District Court denied both cross-motions for summary judgment. Specifically with regard to the issue of qualified immunity, the District Court ruled that if all disputed facts were viewed in the light most favorable to Wright, a reasonable fact-finder could conclude that O'Malley and Heeney unreasonably dismissed Wright's purported reason for her break-in – to obtain evidence of the sexual assault against her – and that the reason for the break-in should have negated any perception of probable cause to suspect that Wright had the requisite intent for the burglary. The District Court did not analyze, independently, whether probable cause existed to arrest Wright for criminal trespass. O'Malley and Heeney appeal the denial of their motion for summary judgment on their defense of qualified immunity.

## II. Jurisdiction

We first consider whether we have jurisdiction to entertain this interlocutory appeal of the District Court's order

denying qualified immunity to O'Malley and Heeney. At the outset, we note that "the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation," Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002) (collecting cases), because "[if] a case is erroneously permitted to go to trial, then qualified immunity is effectively lost." Id. A decision on qualified immunity, however, "will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." Id. at 278. Despite the interlocutory nature of qualified immunity rulings, they are reviewable on appeal where the dispute does not turn upon "which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of 'clearly established' law." Johnson v. Jones, 515 U.S. 304, 311 (1995). The material facts here are not in dispute. The issue before us is the purely legal question of whether the facts alleged, even in the light most favorable to Wright, were legally sufficient to establish probable cause for her arrest. Therefore, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). We exercise

plenary review of orders rejecting qualified immunity at the summary judgment stage. See Eddy v. V.I. Water & Power Auth., 256 F.3d 204, 208 (3d Cir. 2001).

### III. Discussion

In her action, Wright raises two Fourth Amendment violations: (1) false arrest based on her arrest for burglary, theft, criminal trespass, and criminal mischief, and (2) malicious prosecution based on the same charges. The defendant officers maintain that the District Court erred by denying their summary judgment motion on their qualified immunity defense. They first argue that they violated no constitutional right by arresting Wright because, given the information they possessed, a reasonable person in their situation could have believed that she had committed the property and theft offenses. In the alternative, they submit that even if Wright's constitutional rights were violated, those rights were not clearly established at the time of the arrest. Finally, they claim that neither officer individually had sufficient knowledge of Wright's rape to negate any perceived existence of probable cause.

### A. Qualified Immunity

11

Section 1983 provides a cause of action against any person who, acting under color of state law, deprives another of his or her federal rights. When an officer's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit. See Hunter v. Bryant, 502 U.S. 224, 227 (1991). The primary purpose of affording public officials the privilege of qualified immunity, thus insulating them from suit, is to protect them "from undue interference with their duties and from potentially disabling threats of liability." Elder v. Holloway, 510 U.S. 510, 514 (1994) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982)). The privilege of qualified immunity, however, can be overcome when state officials violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. The Supreme Court, in Saucier v. Katz, explained the analytical process for determining when the privilege of qualified has been overcome:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial

12

inquiry. . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

533 U.S. 194, 201 (2001) (citation omitted).

There is some disagreement as to how Saucier should be interpreted. Specifically, the dispute is whether a court must determine the issue of whether there has been a constitutional violation before reaching the qualified immunity question, or whether that inquiry is the first part of a two-pronged test for qualified immunity. In some cases, we have interpreted Saucier to imply that the issue of qualified immunity is only relevant after a court has concluded that a constitutional violation has occurred. In that view, if there is no constitutional violation, there is no reason to reach the qualified immunity issue. See, e.g., Carswell v. Borough of Homestead, 381 F.3d 235, 237 (3d Cir. 2004). In other cases, we have interpreted Saucier to mean that a defendant is entitled to qualified immunity unless a plaintiff can prove both that a constitutional right has been violated, and then that the constitutional right violated was

**13**

clearly established. See, e.g., <u>Bennett v. Murphy</u>, 274 F.3d 133, 136-37 (3d Cir. 2002). Under either interpretation, if no constitutional violation is found, a court need not address whether a reasonable officer would have known he or she was violating a clearly established right. As a practical matter, the outcome will be the same whether we conclude that the officers are immune from suit or instead, that the plaintiff has no cause of action.

Our concurring colleague believes that <u>Brosseau v. Haugen</u>, ___ U.S.___, 125 S. Ct. 596 (2004), conclusively resolves this dispute in favor of the first interpretation. We note that at least six of our sister Courts of Appeals would seem to disagree. <u>See</u> <u>Sample v. Bailey</u>, ___ F.3d ___, No. 04-4174, 2005 U.S. App. LEXIS 8328, at *17-*19 (6th Cir. May 9, 2005) (holding that the first step in the qualified immunity analysis is whether a constitutional violation has occurred); <u>Simkins v. Bruce</u>, ___ F.3d ___, No. 04-3072, 2005 U.S. App. LEXIS 8073, at *3-*5 (10th Cir. May 9, 2005) (same); <u>Harris v. Coweta County</u>, ___ F.3d ___, No. 03-15094, 2005 U.S. App. LEXIS 6721, at *7 (11th Cir. April 20, 2005) (same); <u>San Jose Charter</u>

14

of the Hells Angels Motorcycle Club v. City of San Jose, 402

F.3d 962, 971 (9th Cir. 2005) (same); Craighead v. Lee, 399

F.3d 954, 961 (8th Cir. 2005) (same); Riverdale Mills Corp. v.

Pimpare, 392 F.3d 55, 60-61 (1st Cir. 2004) (same). Those

Courts of Appeals considered Brosseau and yet still treated the

constitutional violation as part of the qualified immunity test, as

opposed to a separate inquiry like our concurring colleague

recommends.[2] See also Burke v. Town of Walpole, ___ F.3d

___, No. 04-1226, 2005 U.S. App. LEXIS 7105, at * 22 (1st Cir.

Apr. 25, 2005); Beard v. Whitmore Lake Sch. Dist., 402 F.3d

598, 603 (6th Cir. 2005); McVay v. Sisters of Mercy Health

Sys., 399 F.3d 904, 907-08 (8th Cir. 2005).[3] Accordingly, at

least two of those Courts of Appeals have specifically concluded

that defendants would be entitled to qualified immunity upon a

determination that no constitutional violation was committed.

See Sample, 2005 U.S. App. LEXIS 8328, at *18 ("Qualified

---

[2] Although only Riverdale discussed Brosseau in the context of the structure of the inquiry, all of the cases cited Brosseau for some proposition, indicating the Courts' familiarity with the case.

[3] As indicated by the cases, the First, Sixth, and Eighth Circuits have considered qualified immunity doctrine in light of Brosseau multiple times and analyzed the constitutional violation as the first part of the qualified immunity inquiry.

immunity must be granted if the plaintiff cannot establish each of these elements.") (quotation omitted); <u>Riverdale</u>, 392 F.3d at 65 (holding that defendants were entitled to qualified immunity when there was no constitutional violation). We believe that those Courts of Appeals acted reasonably in reading <u>Brosseau</u> as consistent with a two-step qualified immunity <u>inquiry</u>, with the first step being the "constitutional <u>issue</u>" and the second being "whether the right was clearly established."

This case, however, does not require us to decide between the two readings of <u>Saucier</u> because the constitutional violation was presented to us in the context of qualified immunity. Specifically, in the course of asserting their claim for qualified immunity, Heeney and O'Malley argue there was no constitutional violation. We recognize that a conclusion that no constitutional violation took place would also negate an essential element of the § 1983 claim, <u>see</u> <u>Albright v. Oliver</u>, 510 U.S. 266, 271 (1994), but the constitutional violation is best addressed as an aspect of the qualified immunity analysis because that was the jurisdictional basis for this interlocutory appeal, <u>see</u> <u>Swint v. Chambers County Comm'n</u>, 514 U.S. 35,

49-50 (1995). While we could construe the officers' arguments as challenging Wright's cause of action, we believe the proper way for us to review the constitutional violation here is through the qualified immunity denial. Accordingly, this opinion analyzes the threshold inquiry, whether the officers' conduct violated Wright's constitutional rights, as the first part of the qualified immunity analysis.

### B. Probable Cause

The Fourth Amendment provides that people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. To determine whether an arrest is valid, we look to the law of the state where the arrest took place. United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citing Ker v. California, 374 U.S. 23, 37 (1963) (plurality opinion)). Under Pennsylvania law, police officers can execute warrantless arrests for felonies and any grade of theft and attempted theft. See 18 Pa. Cons. Stat. Ann. § 3904; Commonwealth v. Taylor, 677 A.2d 846 (Pa. Super. Ct. 1996) (noting that police officers may make

warrantless arrests for felonies or breaches of the peace).  An arrest by a law enforcement officer without a warrant "is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  Devenpeck v. Alford, 125 S. Ct. 588, 593 (2004).

While "[t]he probable-cause standard is incapable of precise definition or quantification," Maryland v. Pringle, 540 U.S. 366, 371 (2003), all interpretations of probable cause require a belief of guilt that is reasonable, as opposed to certain, see Hill v. California, 401 U.S. 797, 804 (1971) ("Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment. . . .").

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  Adams v. Williams, 407 U.S. 143, 149 (1972).  Therefore, the evidentiary standard for probable cause is significantly lower than the standard which is required for conviction.  See Michigan v. DeFillippo, 443 U.S. 31, 36 (1979) ("We have made clear that the kinds and degree of proof and the procedural requirements necessary for a conviction

are not prerequisites to a valid arrest.") (citations omitted); Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (holding that probable cause only requires a "fair probability" that a person committed the relevant crime).  An arrest was made with probable cause if "at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91 (1964) (citations omitted).  In other words, the constitutional validity of the arrest does not depend on whether the suspect actually committed any crime.  Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003).  Importantly for this case, it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with, Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994) ("Probable cause need only exist as to any offense that could be charged under the circumstances."), or whether a person is later acquitted of the crime for which she or he was arrested, DeFillippo, 443 U.S. at 36;  see also Devenpeck, 125 S. Ct. at 594 ("The rule that the

19

offense establishing probable cause must be 'closely related' to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest is inconsistent with [] precedent.").

Wright contends that because the officers were aware of each other's investigations, Heeney should have known that Wright broke a window and entered Pue's home to retrieve her clothes and to gather evidence to prove she had been assaulted. She argues therefore, that Heeney knew or should have known that there was no criminal intent to commit any offense. The officers argue that they had probable cause to arrest Wright because they reasonably believed she committed burglary, theft, or criminal trespass. They contend that a reasonable belief that she committed any of these offenses entitles them to qualified immunity. We agree.

Whether any particular set of facts suggest that an arrest is justified by probable cause requires an examination of the elements of the crime at issue. We focus our inquiry on whether the officers had probable cause to arrest her for the offense of criminal trespass. Section 3503(a)(1) of the Pennsylvania Crime

Codes provides that a person commits the offense of criminal trespass when:

> knowing that he is not licensed or privileged to do so, he:
> (i) enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure or separately secured or occupied portion thereof; or
> (ii) breaks into any building or occupied structure or separately secured or occupied portion thereof.

18 Pa. Cons. Stat. Ann. § 3503(a)(1).[4]

Under this statute, probable cause exists for an arrest for criminal trespass when the facts and the circumstances are sufficient for a prudent person to believe that the suspect: (1) entered or broke into a building or occupied structure, (2) knowing that she or he had no license or privilege to do so. Unlike burglary, which requires proof of criminal intent, criminal trespass merely requires proof of scienter, in other words, that the defendant had knowledge of a lack of license or privilege to enter. Commonwealth v. Williams, 496 A.2d 31, 42-43 (Pa. Super. Ct. 1985) (citing Commonwealth v. Carter,

---

[4]The offense of criminal trespass is a felony. 18 Pa. Cons. Stat. Ann. § 3503(a)(2).

393 A.2d 660, 661 (Pa. 1978)).

Looking at the facts in the light most favorable to Wright, we assume she entered the residence to retrieve her clothes and evidence of her assault under the mistaken belief that she had license or privilege to enter. But, we are concerned here only with the question of probable cause, not Wright's guilt or innocence. Thus, even if Wright lacked the requisite knowledge to commit criminal trespass, we must evaluate whether the totality of the circumstances was sufficient to justify a reasonable belief on the part of the officers that Wright had committed a crime.

Wright admitted to police that she broke a small window pane and entered the Cedar Park residence. She left with bags containing various items from the residence including wine, watches, clothes, and other items that were unlikely to help the police identify her attackers. She turned those bags over to the police only after her mother alerted the police as to her possession of them. Pue said that neighbors had seen a woman at her house with her brother. Heeney found a slip of paper with Wright's name on it at the scene of the alleged burglary.

Although her explanation for entering Pue's residence is a factor in the probable cause analysis, it is not dispositive. The probable cause inquiry looks to the totality of the circumstances; the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate. The officers did not believe Wright's explanation for her entry. Although they may have made a mistake, their belief was not unreasonable in light of the information the officers possessed at the time. See Paff v. Kaltenbach, 204 F.3d 425, 437 (3d Cir. 2000). Wright admitted breaking a window and entering the residence and removing items of little or no evidentiary value, and she returned those items only after the police were alerted to the fact that she had them. In addition to those facts, there was an identification by a neighbor and her name was found on a piece of paper in the house. In those circumstances, we cannot say that the officers acted in an unreasonable manner.

In its opinion, the District Court determined that "there are disputed factual issues which bear directly upon the question of whether a reasonable police officer could have mistakenly

believed that there was probable cause to arrest [Wright]." (App. 34.) The District Court reached this conclusion, however, by focusing on the offense of burglary and not the other offenses against Wright. When we consider the offense of criminal trespass, we conclude that the officers had probable cause to arrest her for this offense. Accordingly, Wright's warrantless arrest for criminal trespass was not a seizure in violation of the Fourth Amendment.

Finding no constitutional violation, we reverse the District Court's denial of summary judgment based on qualified immunity. In light of this decision, we need not address whether probable cause existed for the other two felony offenses, burglary and theft, with which she was charged. See Barna, 42 F.3d at 819.

### C. Malicious Prosecution

Our decision also disposes of Wright's remaining § 1983 claim– malicious prosecution. Wright bases her malicious prosecution claim on alleged Fourth Amendment violations arising from her arrest and prosecution. To prevail on this claim, she must show that the officers lacked probable cause to arrest

her. As already discussed, however, there was probable cause for Wright's arrest and prosecution for criminal trespass based on the information available to the officers at the time of her arrest. Even though our discussion of probable cause was limited to the criminal trespass claim, it disposes of her malicious prosecution claims with respect to all of the charges brought against her, including the burglary. Because Wright failed to establish that a constitutional right was violated, the officers are entitled to qualified immunity with respect to the malicious prosecution claim as well.

## IV. Conclusion

We have considered all of the arguments advanced by the parties and conclude that no further discussion is required. Accordingly, the judgment of the District Court will be reversed.

*Wright v. City of Philadelphia*, Case No. 03-1633

SMITH, *Circuit Judge*, concurring.

Although I reach the same result as does the majority, I write separately to explain how in my view we should characterize the nature of our inquiry in this case. While the majority considers this issue to be unsettled, I believe that position is no longer tenable under Supreme Court precedent.

According to the majority, it is unclear whether a court must determine the existence *vel non* of a constitutional violation *before* weighing whether officials sued for that violation are protected by qualified immunity, or whether the first determination is part and parcel of the second. I agree that the confusion in this area began in *Saucier v. Katz*, 533 U.S. 194 (2001), and that our cases reflect that confusion. *Saucier* taught that a court required to rule on a qualified immunity issue must consider a "threshold" question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established," the Court continued, "there is no necessity for further inquiries concerning qualified immunity." *Id*. The final clause in that statement can be read two ways, and we have employed both readings. At times, we have reasoned that the existence of a constitutional violation is part of the qualified immunity inquiry. *See, e.g., Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2001) ("If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity.")). At other times, we have declared that determination of the constitutional issue precedes qualified immunity. *See, e.g., Carswell v. Borough of Homestead*, 381 F.3d 235, 237 (3d Cir. 2004).

26

I believe that *Brosseau v. Haugen*, 125 S. Ct. 596 (2004) (per curiam), clarifies the correct reading of *Saucier* on this question. In *Brosseau*, the Court considered whether a police officer violated a clearly established constitutional right when the officer shot a fleeing suspect in the back. According to the Court, this inquiry was separate from the question whether a constitutional right was violated in the first place. "We express no view as to the correctness of the Court of Appeals' decision on the constitutional question itself," the Court explained, *id*. at 598, but added that, "[w]e believe that, however that question is decided, the Court of Appeals was wrong on the issue of qualified immunity." *Id*. Importantly, the Court provided this disclaimer: "We have no occasion to reconsider our instruction in [*Saucier*] that lower courts decide the constitutional question prior to deciding the qualified immunity question." *Id*. at 598 n.3. As the concurring opinion in *Brosseau* emphasizes, this last point is not merely a matter of semantics. Joined by Justices Scalia and Ginsburg, Justice Breyer stated:

> I am concerned that the current rule [requiring lower courts to consider the constitutional question before the qualified immunity question] rigidly requires courts unnecessarily to decide difficult constitutional questions when there is available an easier basis for the decision (e.g., qualified immunity) that will satisfactorily resolve the case before the court. Indeed, when courts' dockets are crowded, a rigid "order of battle" makes little administrative sense and can sometimes lead to a constitutional decision that is effectively insulated from review.

125 S. Ct. at 600-01 (Breyer, J., concurring).[5] Justice Stevens,

---

[5]In favor of its prescribed "order of battle," the *Saucier* Court for its part explained that

> [i]n the course of determining whether a

27

dissenting, seemed equally convinced that the constitutional and qualified immunity inquiries are separate. *See id.* at 601. Tallying the votes, I conclude that while some Justices of the Supreme Court do not like the rule, all nine Justices read *Saucier* to require two separate inquiries, a constitutional inquiry and a qualified immunity inquiry, and at least eight Justices believe the former must precede the latter.[6]  Accordingly, I disagree with the majority that, in the wake of *Brosseau*, "[t]here is some disagreement as to how *Saucier v. Katz*, which sets forth the qualified immunity inquiry, should be interpreted."

The majority appears to attempt to avoid confusion by re-labeling the second prong of the *Saucier* test.  Whereas *Brosseau* refers to the second prong of the *Saucier* test as addressing the "qualified immunity" issue, the majority refers to that prong as addressing "whether the right was clearly established."  While I share the concern motivating this seemingly commonsensical change, I think it conceals the basic problem with the majority's

> constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.  This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry.  The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

533 U.S. at 201.

[6]Unlike the concurring Justices in *Brosseau*, Justice Stevens in dissent did not clearly agree with the *Brosseau* majority that courts must settle the constitutional question *before* the qualified immunity question.  *See* 125 S.Ct. at 601.

28

approach. That is, the Supreme Court seems clearly to view the second prong of the *Saucier* test as the essential "qualified immunity" inquiry – not as part of a larger qualified immunity inquiry. *See Saucier*, 533 U.S. at 208 ("[b]ecause we granted *certiorari* only to determine whether qualified immunity was appropriate, however, and because of the limits imposed on us by the questions on which we granted review, we will assume a constitutional violation could have occurred on the facts alleged . . . ."). We should do the same.

Unfortunately, in my view the majority compounds its error in describing the nature of our inquiry by holding that the officers in this case were entitled to qualified immunity because there was no constitutional violation. *See* Maj. Op. at 2 ("[W]e conclude that there was no constitutional violation. Therefore, we hold that the officers were entitled to qualified immunity and we will reverse denial of the officers' motion for summary judgment.") To my knowledge, only one of our sister circuits has gone this far. *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 65 (1st Cir. 2004) (holding that government agents were entitled to qualified immunity because the plaintiff failed to establish a constitutional violation under Saucier's first prong).[7] By contrast, the Eleventh Circuit speaks neither of the qualified immunity inquiry as consisting of two steps, *see Evans v. Stephens*, ___ F.3d ___, No. 02-16424, 2005 WL 1076603, at *4 (11th Cir. May 9, 2005) (*en*

---

[7]The other cases from the Courts of Appeals cited by the majority do speak of *Saucier*'s two-step qualified immunity inquiry, but they do not cite *Brosseau* to support that characterization. *See Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) (considering *Brosseau*'s instructions regarding *Saucier*'s second prong); *Beard v. Whitmore Lakes Sch. Dist.*, 402 F.3d 598, 607 (6th Cir. 2005) (same); *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 978 n.17 (9th Cir. 2005) (same). *See also Simkins v. Bruce*, ___ F.3d ___, No. 04-3072, 2005 WL 1077718, at *1 (10th Cir. May 9, 2005) (same).

*banc*),[8] nor holds that failure to establish a constitutional violation triggers qualified immunity. *See Purcell v. Toombs County*, 400 F.3d 1313, 1324 (11th Cir. 2005) (Edmondson, C.J.).[9] As the majority's terminology and holding seem to me inconsonant with *Brosseau*, I believe the Eleventh Circuit employs the better approach.

Ultimately, the majority apparently feels compelled to hold that the officers have qualified immunity because "that was the basis for this interlocutory appeal." In other words, the majority seems to believe that what arrived in a "qualified immunity" envelope cannot be returned in a "failure to state a claim" envelope. I disagree with the majority for two reasons.

First, the purpose of the qualified immunity doctrine is to "permit insubstantial lawsuits to be quickly terminated," *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982), i.e., to allow the "dismissal of insubstantial lawsuits without trial." *Id*. In other words, the essential reason we are permitted to exercise interlocutory jurisdiction when qualified immunity is denied by a district court is broadly to determine whether dismissal is appropriate. "Unless the plaintiff's allegations *state a claim* of violation of clearly established law," the Court has explained, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis added). Thus, "[a] court evaluating a claim

---

[8]*But see Harris v. Coweta County*, ___ F.3d ___, No. 03-15094, 2005 WL 901889, at *2 (11th Cir. Apr. 20, 2005) (describing two-step *Saucier* test as plaintiff's burden to show that qualified immunity is not appropriate).

[9]*See also Myers v. Redwood City*, 400 F.3d 765, 770 (9th Cir. 2005) ("Although we conclude that the Defendants did not violate the constitutional rights of the Plaintiffs, given the complexity of the question, we will address the easier question of qualified immunity as well.").

of qualified immunity must first determine whether the plaintiff has *alleged a deprivation of a constitutional right at all*, and if so, proceed to determine whether that right was clearly established at the time of the violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (emphasis added; citation omitted). In my view, where no such claim is stated, dismissal on that ground – rather than on the ground that the officials are immune – is appropriate.

Second, the majority's reasoning contravenes the purpose of the two-step *Saucier* inquiry. As discussed above, *Saucier*'s "order of battle" is designed to force courts to establish precedent on the contours of constitutional rights to provide guidance for law enforcement officers. *See* 533 U.S. at 201, 207. Applying this approach, a court may find that an official's alleged conduct was constitutionally permissible *or* that the conduct, while constitutionally impermissible, did not cross a "clearly established" line. Referring to both of these scenarios as establishing "qualified immunity" sends a confusing signal to law enforcement officials concerning what actions they may or may not take. The majority's reasoning thus ironically has the potential to frustrate the development of "clearly established" law, the very *raison d'etre* for *Saucier*'s two-step test.

In view of the foregoing, I believe the proper analytical course in this case would be first to consider whether the defendants violated the Constitution. Because we answer that question in the negative, Ms. Wright lacks a cause of action. That determination should end our inquiry, and we should decline to reach the "second, qualified immunity question." *Brosseau*, 125 S. Ct. at 597.