**NOT PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 17-1882

JESSICA OLSON; MICHAEL WATTS,

v.

DETECTIVE ATEM K. AKO, Badge #2114, individually and in his official capacity;
DETECTIVE CHRISTINE SULLIVAN, Badge #___ individually and in her official
capacity; DETECTIVE JOHN DOE #1, individually and in his official capacity,

Detective Atem K. Ako; Detective Christine A. Sullivan,
Appellants

On Appeal from the United States District Court
for the District of New Jersey
(District Court No.:  1-16-cv-00697)
District Judge:  Honorable Joseph H. Rodriguez

Submitted under Third Circuit LAR 34.1(a)
on February 9, 2018

Before:  CHAGARES, SCIRICA, RENDELL, <u>Circuit Judges</u>

(Opinion filed: March 20, 2018)

## O P I N I O N[*]

**RENDELL**, <u>Circuit Judge</u>:

In this 42 U.S.C. § 1983 case, Defendants-Appellants appeal the District Court's denial of their qualified immunity defense at the dismissal stage. Plaintiffs-Appellees' Fourth Amendment claims arise from (1) a search warrant obtained by Defendant Detective Ako following his receipt of a young woman's troubling police statement depicting Plaintiffs' alleged efforts to groom her to participate in a coercive relationship, and (2) arrests made for involuntary servitude and money laundering after searching Plaintiffs' home pursuant to that warrant. The District Court denied Defendants' motion to dismiss on qualified immunity grounds on the basis of our non-precedential opinion in *Newland v. Reehorst*, 328 F. App'x 788 (3d Cir. 2009) (per curiam), which cautioned against deciding on immunity without a developed factual record. Because there was a robust factual record before the District Court, however, this reliance was misplaced. And on that record, Plaintiffs' Fourth Amendment claims should have been dismissed on qualified immunity grounds because they offer no convincing allegations that the Detectives' particular conduct violated clearly established law.

For the reasons that follow, we will vacate the District Court's order denying Defendants' motion to dismiss and remand with instructions to grant the motion.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

# I. BACKGROUND

In 2014, Plaintiffs Michael Watts and Jessica Olson were arrested for involuntary servitude and money laundering after officers from New Jersey's Division of Criminal Justice ("DCJ")'s Human Trafficking Unit executed a warrant to search their house for evidence of prostitution and human trafficking.

## A. R.W.'s statement to police

Defendant Detective Ako of DCJ drafted the warrant[1] after being alerted by Watts' probation officer[2] that there were several "young girls" staying at Watts' home, and that there were security cameras set up outside the house. A. 239–40. The officer also gave Ako a copy of a statement that an eighteen-year-old woman, R.W., gave to the Delran, New Jersey police after her mother reported R.W. was being held against her will. **A. 238–40.**

R.W. told police that she met Olson through a coworker and that Olson told her she would teach her how to be an exotic dancer and "make real money." **A. 251; 260–61.** A. 261. Olson took her out to meals, took her to see the strip club, and despite R.W.'s initial reluctance, she eventually asked Olson to help her move out of her mother's home in order to rent a room in Watts' home, where Olson also lived. **A. 262; 264–65.**

When R.W. arrived at Plaintiffs' home, she met Watts, and told police that he made her feel "scared" and "uncomfortable." A. 280–81. The first thing he said to her

---

[1] Defendant Christine Sullivan is the DCJ detective who drafted the return on the search warrant.
[2] Watts was under supervised release after pleading guilty to federal charges related to human trafficking.

was "you're my bitch now," and Olson insisted that she call Watts "Daddy" and listen to him.  A. 267.  The members of the household said they "work as a team, a family."  A. 281.  Watts told R.W. that she "need[ed] him," and there was "nothing" for her at home.  A. 277.  These comments led R.W. to believe Watts was "trying to be a pimp."  A. 280.

Next, R.W. told police that Watts took her cell phone and replaced it with a new iPhone with a shirtless photo of himself as the background, saying she no longer needed her old phone.  **A. 269–70.**  He also asked her to be in a documentary which was to focus on the polyamorous relationship between Watts and the other women in the house.  **A. 285.**  When R.W. declined, Watts replied "that's gonna be a problem."  A. 285.

Olson left R.W. alone with Watts, which caused R.W. to become concerned, contact her mother, and ask her to pick her up.  Then, R.W.'s mother contacted the police, and they organized a fake arrest at R.W.'s request, so that she could avoid explaining anything to Watts or making him "mad."  **A. 276.[3]**

### B. Search Warrant and Arrests of Plaintiffs

Based on R.W.'s statement, Detective Ako of DCJ's Human Trafficking Unit sought a warrant to search Plaintiffs' home for evidence of human trafficking, kidnapping, and prostitution.[4]  **A. 231.**  A supervising prosecutor reviewed his warrant application, and a judge granted it.  **A. 230; 233.**

---

[3] When police arrived, R.W. "asked the cop if he could put [her] in handcuffs, and just say that [she] was getting arrested" to avoid explaining anything while Watts was "listening."  **A. 276.**

[4] The New Jersey Attorney General may "participate in" or "initiate any investigation, criminal action or proceeding."  N.J. Stat. Ann. § 52:17B-107(a).

4

Detective Ako listed his law enforcement experience and connected aspects of R.W.'s account to factors that, based on this experience, indicated "promoting prostitution and human trafficking." A. 241. Those connections, which Ako found indicative of something more problematic than a mere new friendship, were as follows:

1. Ako wrote that promoters often have victims call them "Daddy" to conceal their identities and exert power over the women. Ako substantiated this by noting that R.W. had to refer to Watts as "Daddy" and that the first thing he said to her was "you're my bitch now." A. 241.

2. Ako wrote that promoters "often attempt to isolate their victims from their families by taking their phones and other devices used to contact family members and friends" and further isolate them by trying to make them believe that they are family and they have no one else. A. 242. Ako substantiated this with Watts' statements that R.W. did not need her family anymore and his confiscation of her cell phone.

3. Ako noted that promoters often take victims' forms of identification. He learned from R.W.'s mother that, according to R.W., Watts copied her social security and medical insurance cards, but did not return the originals, and scheduled a medical appointment for her. **A. 242–43**

Upon executing the search warrant, DCJ officers found that two young adult women, J.C. and M.R, were also living in the house. **A. 290.** They also found three bags containing around $147,000 in cash. **A. 317–23.**

5

**C. DCJ Detectives interview J.C. and M.R.**

Officers then interviewed J.C. and M.R., who corroborated aspects of R.W.'s account cited in Ako's affidavit. Each referred to Watts as "Daddy," and said that he confiscated their cell phones and replaced them with new ones. **A. 146, A. 175; A. 180; A. 183**. J.C. said that he called them his "bitches," and that he warned them not to talk to anyone else because they were "family." A. 180; 184. They told police that Watts had "rules" and at times used physical force and "emotional stress" to enforce them. A. 132–33; A. 169–70; A. 185; A. 195–98.

Additionally, J.C. told the detectives that Plaintiffs lured young women from other states to live in their house with promises of making lots of money working for them. A. 98–229. She described a pattern similar to R.W.'s account, in which Plaintiffs recruited young women and arranged transportation for them to live in New Jersey, and then instructed them to surrender their dancing earnings. **A. 116; A. 188–90**. Specifically, J.C. and M.R. could not retain any money for personal use or savings, and relied on Plaintiffs to buy them what they needed or supervise their shopping. **A. 116–19; A. 188–89**. They also had to ask for permission to leave the house. **A. 129–30.** J.C. told police that she tried to leave to live with her family in Florida, only to realize she had to return because she had no money and relied on Plaintiffs for everything. **A. 226.**

Based on these accounts, R.W.'s statement, and the return on the search warrant, police arrested Plaintiffs and charged them with money laundering and involuntary servitude. **A. 64–65; A. 94–97.**

6

### D. Procedural History

New Jersey dropped all charges against Plaintiffs for reasons unknown. **A. 67.** They then filed a civil complaint in the District of New Jersey against the DCJ, a former DCJ director, Ako, and Sullivan. Plaintiffs averred that Defendants, in their official and individual capacities, falsely arrested, maliciously prosecuted, and unreasonably searched and seized them and their property without probable cause. A. 65–91. Defendants moved to dismiss and for a more definite statement. After the parties engaged in limited pre-answer discovery for Plaintiffs to produce a more definite statement, the District Court granted leave to file an amended complaint.

Plaintiffs' Amended Complaint had six exhibits attached, including interview transcripts and Ako's affidavit. A. 62–359. The District Court granted Defendants' subsequent motion to dismiss all official capacity claims and all claims under the Fifth and Fourteenth Amendments, but denied their motion to dismiss all Fourth Amendment claims on qualified immunity grounds. A. 3.

In denying qualified immunity, the District Court cited our non-precedential opinion in *Newland v. Reehorst*, 328 F. App'x 788 (2009) (per curiam). In *Newland*, we stated in a footnote that "[w]e caution, however, that it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Id.* at 791 n.3. The District Court noted the favorable inferences to which Plaintiffs were entitled, including the inference that Ako took liberties using his experience to "weave a connective web between certain facts and their indication of illegal conduct" and that some of the post-arrest evidence "paints a

7

benign picture of consenting adults engaging in group living." A. 14. It concluded that qualified immunity did not attach at that stage, but that it could be raised on summary judgment. A. 15. Defendants appealed.

## II. DISCUSSION

The District Court had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983, and we have jurisdiction pursuant to 28 U.S.C. § 1291. "We exercise de novo review of a district court's denial of a motion to dismiss on qualified immunity grounds." *George v. Rehiel*, 738 F.3d 562, 571 (3d Cir. 2013) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012)). But we "must accept [a] plaintiff's allegations as true and draw all inferences in his or her favor." *Id.*

On appeal, Defendants contend that the District Court improperly relied on dictum from our non-precedential opinion in *Newland*, and that Plaintiffs had not plausibly averred facts or law establishing that Detectives lacked probable cause for the search or arrest warrants. For the following reasons, we agree.

### A. Qualified Immunity

Qualified immunity "gives ample room for mistaken judgments" by shielding "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986). This accommodation recognizes our societal interest in law enforcement's pursuit of investigations unconstrained by the constant fear of being sued. *See Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Officers are entitled "not to stand trial or face the other burdens of litigation" unless it can be shown that (1) they violated a statutory or constitutional right and (2) the

8

right was clearly established at the time of the conduct. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). We can consider "which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). And we can dismiss claims under prong two "without ever ruling on" prong one. *Camreta v. Greene*, 563 U.S. 692, 705 (2011).

The Supreme Court has repeatedly emphasized "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227. Moreover, "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Here, the District Court correctly noted that "a finding of qualified immunity should be made at the earliest possible point," but then allowed Plaintiffs' claim to proceed without so finding. A. 14–15. In support, the District Court cited language from our non-precedential opinion in *Newland v. Reehorst*, 328 F. App'x 788 (3d Cir. 2009) (per curiam), "caution[ing] . . . that it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Id.* at 781 n.3. But this ignores the detailed factual record before the Court, including documents relevant to the police investigation, in response to Defendants' Fed. R. Civ. P. 12(e) motion for a more definite statement.

A defense motion for a more definite statement is appropriate to "facilitate an early resolution of the qualified immunity issue." *Thomas v. Independence Twp*., 463 F.3d 285, 300 (3d Cir. 2006). Here, Defendants moved alternatively to dismiss or for a more definite statement. When the Court granted their 12(e) motion, they provided

9

Plaintiffs with relevant documents from the underlying criminal matter. Plaintiffs then filed an amended complaint, attaching exhibits including: the arrest warrants for the Plaintiffs, the interviews of M.R. and J.C., the search warrant and Detective Ako's supporting affidavit, the interview with R.W., the investigation report following the execution of the search warrant, and evidence vouchers signed by Defendant Sullivan. The District Court therefore had a record sufficient to rule on qualified immunity.

Considering whether the Defendants are immune, the pertinent question "is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997), *abrogated in part on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007). The unlawfulness of the conduct must have been placed "beyond debate" in light of "controlling authority" or "a 'robust consensus of . . . persuasive authority.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (quoting *Wilson v. Layne*, 526 U.S. 503, 617 (1999)).

Here, neither of Plaintiff's generalized Fourth Amendment claims convincingly places Defendants' conduct in the orbit of unlawful, let alone unlawful "beyond debate." Indeed, the Supreme Court has emphasized that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742. And "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015).

Plaintiffs' allegations "are the kinds of broad propositions of law that cannot guide a court in determining whether a constitutional right is clearly established." *Thomas*, 463 F.3d at 300. And even if we were to consider their allegations at the broad level of generality requested, Plaintiffs have failed to identify, for either claim, a case where an officer in similar circumstances was held to have violated the Fourth Amendment.

We consider each claim in turn.

## B. Search Warrant

Plaintiffs first complain that the search warrant was factually baseless and therefore unsupported by probable clause. In evaluating this claim, we ask whether it was "clearly established that the circumstances with which [the officer] was confronted did not constitute probable cause." *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987). This means that we "look at the circumstances that confronted [the officer] and . . . compare the circumstances present in those cases which have concluded that there was an absence of probable cause." *Paff v. Kaltenbach*, 204 F.3d 425, 437 (3d Cir. 2000).

As a preliminary matter, we note that a judge granted Defendant Ako's warrant application. This fact indicates to us that he acted in an "objectively reasonable manner," though it does not end our inquiry. *See Messerschmidt v. Millender*, 565 U.S. 535, 546–47 (2012).[5]

---

[5] We further note that in the analogous arrest warrant context, when, as here, a supervising prosecutor reviews and approved the warrant, officers are "presumptively entitled to qualified immunity from Fourth Amendment claims based on a lack of probable cause." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 256 (2010).

11

In short, Plaintiffs have offered no controlling legal authority to suggest that Defendants did not have probable cause to search their home. Instead, they offer recitations of hornbook Fourth Amendment law and innocent explanations for the conduct that Ako connected to human trafficking in his affidavit. Even in light of the favorable inferences to which they are entitled, these alternative justifications are unconvincing. For example, they make much of the allegation that Watts confiscated R.W.'s flip phone, but then gave her a brand new iPhone in exchange. We are skeptical that controlling a person's means of communicating with the world—even if via an upgraded device—evinces an innocent overture of friendship. In any event, we fail to see how "no reasonable officer" would have thought there was probable cause here. *Cf. Groh v. Ramirez*, 540 U.S. 551, 563 (2004). And even if Defendants had "reasonably but mistakenly conclude[d] that probable cause [was] present," they would still not be personally liable. *Anderson*, 483 U.S. at 641.

Plaintiffs also belatedly contend that the Defendants violated the prohibition against general warrants by seeking a warrant for "virtually everything that could be deemed evidence of any crime." Appellees' Br. at 36. This allegation is meritless.[6] Also, it did not appear in either original or amended complaint, but rather was raised in

---

[6] "The Fourth Amendment does not prohibit searches for long lists of documents or other items provided that there is probable cause for each item on the list and that each item is particularly described." *United States v. $92,422.57*, 307 F.3d 137, 148 (3d Cir. 2002). Here, there was ample basis to conclude that there was probable cause for each item listed, and items were listed with particularity. *See, e.g.*, Search Warrant (Feb. 14, 2014), A. 232 (seeking permission to search for, *inter alia*, "lists containing names . . . evidencing the promotion of prostitution," "financial records," and "sexually explicit objects or materials").

12

opposition to Defendants' Motion to Dismiss.  And it is "axiomatic that the complaint

may not be amended by the briefs in opposition to a motion to dismiss." *Commonwealth*

*of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (quoting

*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)).

## C. Arrest Warrant

Plaintiffs next contend that their arrests were "supported by nothing more than

suspicion and distaste for and lack of understanding of the polyamorous relationship

enjoyed by the plaintiffs and the women that the detective deemed victims."  Appellees'

Br. at 42.  We disagree.  Considering the information Defendants had after the search, it

was "objectively legally reasonable" for them to believe they had probable cause to arrest

Plaintiffs and charge them with involuntary servitude and money laundering.[7]

Lack of probable cause is an element common to false arrest and malicious

prosecution claims, both of which Plaintiffs assert.  *Startzell v. City of Philadelphia*, 533

F.3d 183, 204 (3d Cir. 2008).  Similar to the search context discussed above, to determine

whether an arrest was supported by probable cause, we "look[] to the totality of the

circumstances" and do "not require that officers correctly resolve conflicting evidence or

that their determinations of credibility were, in retrospect, accurate."  *Wright v. City of*

---

[7] Plaintiffs also make much of the fact that the Delran Police Department did not further pursue the underlying criminal matter, and New Jersey dismissed the charges against them.  **A. 43.**  But "the constitutional validity of the arrest does not depend on whether the suspect actually committed any crime," and it is "irrelevant" if he "is later acquitted of the crime for which she or he was arrested."  *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005).  Law enforcement's after-the-fact resource allocation choices simply do not bear on the constitutionality of an arrest.

*Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005). And as the Supreme Court has recently underscored, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, No. 15-1485, ___ U.S. ___ (slip op. at 12) (U.S. Jan. 22, 2018).

We examine "the elements of the crime at issue" for involuntary servitude and money laundering in turn. *Wright*, 409 F.3d at 602.

1. Involuntary Servitude

Under N.J. Stat. Ann. § 2C:13-2(b), "[t]he creation by the actor of circumstances resulting in a belief by another that he must remain in a particular location" is "deemed to be a holding in a condition of involuntary servitude." In addition to "compulsion of services by the use or threatened use of physical or legal coercion," the statute encompasses "situations where a victim may not be actually threatened . . . but where the circumstances created by the defendant have nevertheless resulted in the victims' belief that they are not free to leave." *State v. Marchand*, 545 A.2d 819, 821 (N.J. Super. Ct. App. Div. 1988) (quoting *United States v. Kozminski*, 487 U.S. 931, 945 (1988))

Here, Defendants had statements from J.C. and M.R. suggesting their complete financial dependence on Plaintiffs, leading to the objectively reasonable conclusion that these women believed they were "not free to leave." For instance, they stated they had to surrender their earnings to Olson nightly and could not retain any money for personal use or savings. **A. 115–23; A. 188–93; A. 217–18.** Moreover, J.C. had recently returned from Florida, a trip she saw as her "chance to leave . . . permanently" because she did not have "any of [her] own money" and relied on Watts "for everything." A. 195; A220–21;

14

A. 226. J.C. and M.R. also told Detectives that Watts had various household "rules," including a ban on cursing, and used physical violence when they broke the rules. **A. 132–33, A. 169; A. 184; A. 133–34; A. 169–70; A. 195–98.**

Viewed under the totality of the circumstances, we readily conclude that Defendants had probable cause for the involuntary servitude arrest.

2. <u>Money Laundering</u>

Under N.J. Stat. Ann. § 2C: 21-25(a), a person launders money if he "transports or possesses property known or which a reasonable person would believe to be derived from criminal activity." And "property is known to be derived from criminal activity if the person knows that the property involved represents proceeds from some form, though not necessarily which form, of criminal activity." *Id.* § 21-25(d). Knowledge "may be inferred" if the property "is transported or possessed in a fashion inconsistent with the ordinary or usual means of transportation or possession of such property," and if it is found absent "any documentation or other indicia of legitimate origin or right to such property." *Id.* § 21-26. A large quantity of cash may also provide circumstantial evidence of money laundering. *See United States v. Carr*, 25 F.3d 1194, 1203 (3d Cir. 1994) (concluding a rational trier of fact could find that defendant was a part of a money laundering conspiracy based on, *inter alia*, the $33,000 in small bills found in his apartment).

Here, Defendants found three bags containing large quantities of small bills in the master bedroom, with one containing $2,393 and two others containing $145,400. **A. 317–23**. Added to the fact that J.C. and M.R. told police they were required to surrender

15

their cash earnings nightly, and it was reasonable for police to conclude they had probable cause to arrest plaintiffs for money laundering.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the Defendants are entitled to qualified immunity on Plaintiffs' § 1983 claims. Accordingly, we will vacate the order of the District Court denying Defendants' motion to dismiss and remand with instructions to grant the motion.