Corvet CURLEY; Elaine Curley, Appellants,

v.

Ronald KLEM, a Police Officer sued in his individual capacity; John Doe; Bill Doe, two currently unknown Police Officers also sued in their individual capacities.

No. 01–1093.

United States Court of Appeals, Third Circuit.

Argued Sept. 28, 2001.

Filed Aug. 2, 2002.

David S. Gould (argued), Steven L. Salzman, New York, NY, for Appellants.

Leonard C. Leicht (argued), Morgan, Melhuish, Monaghan, Arvidson, Arbutyn & Lisowski, Livingston, NJ, for Appellee.

BEFORE: ROTH, AMBRO and FUENTES, Circuit Judges.

## OPINION OF THE COURT

FUENTES, Circuit Judge.

This is an appeal from a grant of summary judgment dismissing plaintiff's complaint on the ground that the defendant was shielded from liability by the doctrine of qualified immunity. The defendant, Ronald Klem, a New Jersey State Trooper, shot and seriously injured Corvet Curley, a Port Authority Police Officer, when he mistook Curley for an armed criminal suspect. Klem had been chasing a "tall black male" who had fled in a car after

murdering a police officer. The chase ended on the George Washington Bridge where, after colliding with another vehicle, the suspect shot himself to death. Moments later, Klem arrived at the toll plaza still in pursuit of the suspect. In response to a radio transmission about the chase, Curley, dressed in a standard Port Authority police uniform, also arrived at the plaza. Two witnesses at the scene recognized Curley to be a police officer. Klem, claiming to see a "tall thin black male" with a gun aimed at him, fired his shotgun at Curley.

Alleging violations of his constitutional rights and New Jersey law, Curley brought this 42 U.S.C. § 1983 action against Klem, who invoked the protection of qualified immunity. On cross motions for summary judgment, the District Court dismissed all of Curley's claims, concluding that Klem's conduct was objectively reasonable and, thus, Klem was shielded by the qualified immunity doctrine.

In light of the disputed historical facts pertinent to determining the objective reasonableness of Klem's conduct, we will reverse the grant of summary judgment in favor of Klem and remand for further proceedings.

## I.

At approximately 8:30 p.m., on November 20, 1997, Klem received a radio transmission while on duty advising that a police officer had been shot and killed in Long Branch, New Jersey and that the suspect had fled the scene in the murdered officer's patrol car. The transmission further reported that the suspect had subsequently fired shots at a state trooper on the Garden State Parkway.

Shortly thereafter, Klem received another radio message, this time from State Trooper Michael Michie. According to Curley, Michie stated that the suspect was a "tall, black male" and that he had now carjacked a green Toyota Camry. Klem claims that Michie described the suspect as a "thin, black male."

The suspect, Deon Bailey, had stolen the green Camry at the Interchange 10 rest area of the New Jersey Turnpike. He then continued north on the Turnpike toward the George Washington Bridge. Klem was positioned near the Turnpike's Interchange 14 when he first saw Bailey, who by this point was being pursued by Troopers Robert Mosher and Ronald Drayton. At his deposition, Klem testified that he was aware that they were pursuing a single perpetrator who had shot a police officer in Long Branch and was fleeing north in a series of stolen cars. Mosher was in the lead car closest to Bailey, Drayton was in the second car, and Klem followed close behind them. Mosher advised the other Troopers by radio that Bailey was shooting at him. As the chase continued, one of Bailey's bullets struck Klem's front windshield. Eventually, Mosher dropped out of the chase, fearing that he had been injured by one of Bailey's shots, and Klem became the lead Trooper. Klem and Drayton followed Bailey to the upper level toll plaza of the George Washington Bridge, where Bailey then swerved toward the toll lane farthest to the left. Klem saw Bailey's vehicle stop just beyond the tollbooths but did not know why it had stopped. Later, it became clear that the Camry had stopped because it had collided with a Nissan Pathfinder.

According to Klem, he did not see any other law enforcement officers in the area at the time the Bailey vehicle had stopped. He then took his shotgun, exited the vehicle, and approached the Camry with his shotgun at hip height. The lights and siren from his car remained active. Klem contends that, while moving toward the

Camry, he saw a toll collector signal him with rapid arm motions toward the center of the toll plaza, where Curley happened to be. Curley argues that the toll collector, Tyrone Jenkins, was simply directing him toward the Camry.

Klem testified that when he reached the passenger side window of the Camry, at about 9:25 p.m., he looked in but could see no one. In contrast, Curley contends that Klem could not have looked through the window because, otherwise, he would have seen that Bailey's dead body was sprawled across the front seat. Bailey had committed suicide inside the Camry by firing a bullet into his mouth. Chris Freader, a toll collector who had previously stepped out of his tollbooth after the Camry had crashed into the Pathfinder, testified that he had no difficulty seeing Bailey's body inside the Camry. Trooper Drayton, who arrived on the scene soon after Klem, reported that he did not see Klem look into the Camry from the passenger side.

Klem states that, as he turned toward the center of the plaza, he saw a tall, thin, black male in a three point stance with a gun pointed directly at him, and that he believed that man to have been the fleeing suspect.[1] The man with the gun, however, was actually Curley, a Port Authority police officer who had come to the scene in response to a radio transmission he had received about the Bailey chase. Curley is 6 feet 4 inches tall, weighs 174 pounds, and is black. Curley contends that his gun was only pointed in the direction of the Camry, and that he was not aiming it at anybody or anything. Freader said that he did not see Curley aim his gun at Klem or position himself in the three point stance described by Klem. Thomas Mulligan, a motorist who was present at the scene, also testified that he never saw Curley take a three-point stance or aim his gun at anyone.

Curley was wearing his Port Authority police uniform, which includes a police belt, a large, yellow-rimmed police patch on the shoulder, a silver chest badge, a navy blue shirt, a black tie, and a standard navy blue police jacket. Like Klem, he was not wearing his police hat. Klem maintains that Curley's clothing was dark and that he could not tell that Curley was wearing a uniform of any kind. Klem admitted, however, that there was sufficient light for him to see that Curley was a light-skinned black male. Freader, who was standing farther away from Curley than was Klem, claims that he had no difficulty identifying Curley's uniform as that of a police officer. Mulligan also testified that he recognized Curley as a police officer upon seeing him in his uniform.

Immediately after seeing Curley, Klem did not shoot his weapon at him. Asked later why he failed to shoot when Curley's gun was allegedly pointed directly at him, he explained that he "had froze in fear." From this point on, Klem and Curley offer dramatically different accounts of what transpired. Klem claims that, after a few seconds passed, he screamed for Curley to drop his gun, that Curley responded by bringing his hands down and peddling back towards the Pathfinder for cover, and that he finally shot Curley after Curley had raised his arms up and down three or four times. Klem contends that Curley had partial cover behind the Pathfinder when he shot him, and that he had shouted for Curley to drop his gun several times before shooting. Klem insists that "both arms were up outstretched in front of

---

1. We understand the term "three point stance" to describe a shooting stance where an individual has both feet planted on the ground and holds a firearm with both hands in front of the body.

him." Immediately after Klem shot Curley, he heard someone yell that he had just shot a cop.

In contrast, Curley claims that he did not hear or even see Klem at any time prior to getting shot by him. He explains that he had run about halfway to the Camry, which was about 25 to 30 feet away, realized he had no cover from a potential attack by the suspect, and then began to peddle back so that he could find cover behind his open car door. According to Curley, just as he began moving towards his car, standing out in the open about midway between the Pathfinder and the Camry, he was struck down by Klem's shotgun. He claims that he never got in a three point stance, never pointed his gun at anyone, and never raised his arms up and down as Klem describes. Curley does admit, however, that he approached the Camry with his gun extended in front of him and held with both hands.

Both Trooper Drayton and Mulligan testified that they did not see Curley raise his arms up in the manner described by Klem. Mulligan and Freader claimed that, at the moment of the shooting, Curley's gun was down at his side and not pointed at anyone. Drayton, Mulligan, and Freader all testified that they did not see Curley in a three point stance aiming his weapon at Klem. Freader claimed that after being told that he had just shot a police officer, Klem responded, "They told us black male." Curley suffered permanent injuries from the shooting, including the loss of use of his right leg.

On November 19, 1998, Curley filed a 42 U.S.C. § 1983 claim against Klem in the District Court for the District of New Jersey based on a violation of his Fourth Amendment right to be free from unreasonable seizures.[2] Curley's wife joined the action as a co-plaintiff, alleging loss of consortium claims. Klem moved for summary judgment, arguing that he was shielded by the qualified immunity doctrine. The plaintiff cross-moved for summary judgment as to liability. Finding that, in light of the circumstances confronting him, Klem's conduct was objectively reasonable and, thus, protected by qualified immunity, the District Court granted Klem's motion for summary judgment and denied Curley's cross-motion. With regard to Curley's pendent state law claims, the court further concluded that Klem was shielded from liability under the New Jersey Tort Claims Act. This appeal followed.

## II.

The District Court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. The standard of review applicable to an order granting summary judgment is plenary. *See Witkowski v. Welch,* 173 F.3d 192, 198 (3d Cir.1999). We apply the same test employed by a district court under Federal Rule of Civil Procedure 56(c). *See Kelley v. TYK Refractories Co.,* 860 F.2d 1188, 1192 (3d Cir.1988). Accordingly, the District Court's grant of summary judgment in favor of Klem was proper only if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating the evidence, we are required "to view the

---

**2.** In his federal complaint, plaintiff also presented several claims under state law. Additionally, plaintiff filed a separate lawsuit in the state Superior Court raising virtually identical claims against the State of New Jersey and the state police. Following the District Court's decision in this case, the Superior Court dismissed Curley's state court claims.

inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *Bartnicki v. Vopper*, 200 F.3d 109, 114 (3d Cir.1999).

### III.

■ Plaintiff's claim arises under 42 U.S.C. § 1983. Essentially, § 1983 provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law. *See Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir.2000) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Thus, police officers who, acting under color of state law, violate an individual's federal constitutional or statutory rights are subject to liability under § 1983. In this case, plaintiff alleges that the shooting by Trooper Klem constituted a violation of Curley's Fourth Amendment right to be secure against unreasonable seizures.

■ Section 1983 claims against police officers often raise issues pertaining to the defense of qualified immunity. Under that defense, officers performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■■ While this appeal was pending, the Supreme Court decided the case of *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), in which the Court clarified the analytical framework that courts should employ in determining the doctrine's applicability. The Court explained that a qualified immunity analysis must begin with this threshold question: do the facts alleged, viewed in the light

most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right? *Saucier*, 121 S.Ct. at 2156. If the plaintiff fails to allege the violation of a constitutional right, no further inquiry is necessary. If, however, the alleged facts show that there was a constitutional violation, then the next step is to ask whether the right was clearly established. *See id.* In other words, a court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). This inquiry, the Court noted, "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity. *See id.* at 2156–57.

■■ It is important to emphasize that qualified immunity is not a mere defense from liability; it is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). If a case is erroneously permitted to go to trial, then qualified immunity is effectively lost. *See id.* Accordingly, the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation. *See, e.g., Saucier*, 121 S.Ct. at 2156; *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam); *Anderson v. Creighton*, 483 U.S. 635, 646, n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. In *Hunter*, the Court observed that the issue of immunity should not be routinely submitted to the jury. 502 U.S. at 228, 112 S.Ct. 534.

As this Court has noted previously, however, the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right. *See, e.g., Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir.1996). Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis. Thus, while we have recognized that it is for the court to decide whether an officer's conduct violated a clearly established constitutional right, we have also acknowledged that the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue. *See Sharrar v. Felsing*, 128 F.3d 810, 828 (3d Cir.1997); *see also Karnes v. Skrutski*, 62 F.3d 485, 499 (3d Cir.1995).

Our sister circuits agree upon this general prohibition against deciding qualified immunity questions in the face of disputed historical facts. *See, e.g., Wilson v. City of Des Moines, Iowa*, 293 F.3d 447, 454 (8th Cir.2002); *Santos v. Gates*, 287 F.3d 846, 855 n. 12 (9th Cir.2002); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir.2002); *Knussman v. Maryland*, 272 F.3d 625, 634 (4th Cir.2001); *Kimberlin v. Quinlan*, 199 F.3d 496, 502 (D.C.Cir.1999); *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir.1998); *Swain v. Spinney*, 117 F.3d 1, 10 (1st Cir.1997); *Cottrell v. Caldwell*, 85 F.3d 1480, 1487–1488 (11th. Cir.1996); *Williams v. Pollard*, 44 F.3d 433, 435 (6th Cir.1995); *Apostol v. Landau*, 957 F.2d 339, 342 (7th Cir.1992); *Salmon v. Schwarz*, 948 F.2d 1131, 1139 (10th Cir. 1991). Further, the prohibition does not appear at all inconsistent with the analytical framework recently detailed by the Supreme Court in *Saucier*.

We note that the federal courts of appeals are divided on the question of whether the judge or jury should decide the ultimate question of objective reasonableness once all the relevant factual issues have been resolved. In *Hunter*, the Court stated that "immunity ordinarily should be decided by the court long before trial." 502 U.S. at 228, 112 S.Ct. 534. However, the Court did not address the procedure for deciding the immunity question when the existence of disputed issues of fact precludes disposition on summary judgment.[3]

---

**3.** A disparity of opinion exists among our sister circuits as to whether a judge or jury should make the ultimate immunity determination. Some appear to have interpreted *Hunter* as requiring the judge to decide the ultimate immunity question. *See Swain v. Spinney*, 117 F.3d 1, 10 (1st Cir.1997) (noting that "[t]he ultimate question of whether a reasonable police officer … could have believed his actions were in accord with constitutional rights is a question of law, subject to resolution by the judge [and] not the jury"); *Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir.1996) (noting that "[q]ualified immunity is a legal issue to be decided by the court" and that "jury interrogatories [for disputed factual issues] should not even mention the term"); *Warlick v. Cross*, 969 F.2d 303, 305 (7th Cir.

1992) (stating that the issue of qualified immunity is "a question of law for the court, not a jury question").

Other circuits have endorsed an approach that permits a jury to evaluate the objective reasonableness of a defendant's conduct once the participation of a jury has already become necessary for the resolution of disputed factual issues. *See Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir.2000) (finding no error in instructions charging the jury to consider, in a qualified immunity case, whether the defendant's use of deadly force had been objectively reasonable); *McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir.2000) (stating that, if the qualified immunity issue is not decided until trial, it "goes to the jury which must

We addressed the issue in *Sharrar*, in which we observed that the "reasonableness of the officers' beliefs or actions is not a jury question," 128 F.3d at 828, but qualified that observation by later noting that a jury can evaluate objective reasonableness when relevant factual issues are in dispute, *id.* at 830–31. This is not to say, however, that it would be inappropriate for a judge to decide the objective reasonableness issue once all the historical facts are no longer in dispute. A judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity.

### IV.

#### A. *Qualified Immunity*

To determine whether Klem is protected by qualified immunity, we begin by considering the threshold question of whether the alleged facts, viewed in the light most favorable to Curley, show that Klem's conduct violated a constitutional right. Although the District Court did not expressly address this initial inquiry, we find, through our independent review of the record viewed in this light, that Klem's conduct did, in fact, result in a violation of the Fourth Amendment.

■■■■■ Curley claims that Klem used excessive force when Klem shot him in violation of the Fourth Amendment guarantee against unreasonable seizures. A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable. *See Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir.1999) (citing *Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). A seizure occurs "[w]henever an officer restrains the freedom of a person to walk away." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The detention must be willful, but it is of no import that the detention is of an unintended person. *See Brower*, 489 U.S. at 596, 109 S.Ct. 1378. Thus, even if Klem thought he was firing at a dangerous criminal suspect, his shooting of Curley did constitute a seizure that falls within the purview of the Fourth Amendment.

■■■■■ In considering whether the seizure was "reasonable," we must judge "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This reasonableness inquiry is an objective one. *See id.* at 397, 109 S.Ct. 1865. Accordingly, the question is whether Klem's "actions [were] 'objectively reasonable' in light of the facts and circumstances" confronting him, regardless of his underlying intent or motivation. *See id.* (citing *Scott v. United States*, 436 U.S. 128, 137–39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)). We make our determination based on the "totality of the circumstances," including whether the suspect posed an immediate threat to the safety of the officer or others, whether the suspect was actively resisting arrest, and the severity of the crime at issue. *See Abraham*, 183 F.3d at 289. Again, at this stage

then determine the objective reasonableness of the officers' conduct"); *Ortega v. O'Connor*, 146 F.3d 1149, 1156 (9th Cir.1998) (finding that a district court's submission of the objective reasonableness question to the jury "constituted an appropriate and proper instruc-tion"); *Oliveira v. Mayer*, 23 F.3d 642, 650 (2d Cir.1994) (holding that a district court "should have let the jury ... decide whether it was objectively reasonable for the defendants to believe that they were acting within the bounds of the law....").

of the qualified immunity analysis, where we discern simply whether Curley alleges conduct in violation of a constitutional right, we must consider only the facts alleged by Curley, taken in the light most favorable to him.

Curley alleges that Klem shot him not because the totality of the circumstances indicated that Curley was the armed suspect sought and posed a dangerous threat, but because Klem, ignoring other evidence, acted based on the single fact that Curley, like the suspect, was a black man with a gun. In support of his theory, Curley claims that his gun was never aimed in Klem's direction, that he had turned to retreat in a direction away from Klem at the time he was fired upon, and that there was ample evidence indicating that he was not the suspect, including the fact that he was wearing a standard Port Authority police uniform. Curley further alleges that Klem acted unreasonably by neglecting to look in the window of the Camry, by failing to wait for backup, and by not recognizing that Curley's behavior and movements were inconsistent with those that should have reasonably been expected of the suspect.

We conclude that these facts, viewed in the light most favorable to Curley, are sufficient to support the claim that Klem's shooting of Curley constituted an unreasonable seizure, violative of Curley's rights under the Fourth Amendment. While we recognize the great pressure and intensity inherent in a police officer's hot pursuit of a suspect known to be armed and highly dangerous, we find that under Curley's account of events, it was unreasonable for Klem to fire at Curley based on his unfounded, mistaken conclusion that Curley was the suspect in question.

Having thus found that the facts alleged by Curley demonstrate the violation of a constitutional right, we next ask whether the right was clearly established or, more precisely, "whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" *Saucier*, 121 S.Ct. at 2156 (emphasis added). In this regard, the District Court viewed the circumstances as follows:

[Trooper Klem] knew that a suspect, Deon Bailey, shot and killed a Long Branch police officer. And he knew the suspect took off and [carjacked] two cars at gunpoint and shot [at] state troopers, including himself, who were in pursuit of him.

Over the radio, the description that Klem received and the only one that he received of the suspect was that he was, "a tall black man with short black hair." Driving a green Camry. No other description or build is given. Moreover, no description [of] what the suspect was wearing was given. Klem followed the suspect to the George Washington Bridge and lost sight of him for a short time and saw that the Camry had collided with the Pathfinder in lane two of the toll plaza. He turned and he got his rifle before he got out of his police vehicle to check out the scene. Klem did not see the Camry door open and did not know whether the suspect was still in the car. Klem claims he looked in the car and he did not see the suspect. Still by the Camry, Klem sees a toll collector point to what he thinks is the center of the plaza. When Klem does not see the suspect in the car, and assumes the car did not contain the suspect, based on the pointing of the toll collector, he believed that the suspect had vacated the car and was somewhere in the center of the plaza. Klem moves near the Camry and he sees a black man with a gun back pedaling between the Camry and the Pathfinder and, from his perception, concludes that the gun is being pointed at him.

Curley for his part is in between the Camry and the Pathfinder holding a gun, which at one point he does admit was pointed toward the Camry. Curley says he back pedaled and turning ·around to go back to his police vehicle because he realizes that he, Curley, is out in the open. Curley has no perception that Klem is there and that Klem is making noise, that Klem is pointing again at him. Curley is wearing his uniform, which is navy pants with a black strip. Navy nylon jacket with a blue patch with gold trim on the left arm, stating a Port Authority police officer. Curley states that he was turning to the left and arguably that might have some bearing on whether or not Klem saw the patch. Klem claims that he did not know that this outfit was that of a police officer....

Klem repeatedly yells a warning to Curley to drop his weapon. Curley does not hear the warnings. Curley does not drop his weapon. Klem thinks that Curley is going to shoot him because he perceived the weapon was raised and pointed at him and Klem shoots Curley. Ap. at A14–A16. Based on this assessment of the circumstances confronting Klem, the District Court concluded that his decision to shoot was not objectively unreasonable. The problem with the District Court's analysis, however, is that it did not recognize the existence of disputed historical facts that are clearly material to the question of objective reasonableness. There are disputed issues of material fact with regard to at least two key events— the inspection of the suspect's vehicle and the actual confrontation between Klem and Curley.

### 1. The Body in the Camry

When Klem arrived at the toll plaza, he was unaware that his suspect had just shot and killed himself while sitting inside the stolen Camry. But it is uncontroverted that Klem knew there was only one perpetrator. Thus, had Klem known of Bailey's suicide, it would have been clearly unreasonable for him later to confuse Curley with the suspect. Assuming that a reasonable officer in Klem's position would have looked inside the Camry upon arriving at the scene, a key issue becomes whether Klem did, in fact, look inside the Camry's window.

Klem asserts that, upon arriving at the toll plaza, he approached the Camry, looked in its back window first, and then walked up toward the passenger side window and looked through it. In his deposition, he said that he took a "quick view," one that lasted "[j]ust a second, a split second," and that he did not see anyone inside the vehicle. At deposition, both Klem and Drayton, who both claimed to have looked into the Camry after the shooting, testified that the perpetrator's body was wedged in the floorboards of the car. Curley, however, alleges that Drayton had previously told investigators that the body was lying across the seat.

 Curley denies that Klem could have looked inside the passenger side window of the Camry without seeing Bailey's body slumped in plain view across the front seat. Thus, he contends that Klem never actually looked inside the vehicle. Curley notes that Freader, the toll collector who had walked up to the Camry before Klem's arrival, testified that he had no trouble seeing Bailey's body and that it was sprawled on the passenger seat. According to Curley, the first two state troopers to reach the Camry found the body sprawled in plain view across the front seat, where the toll collector had seen it. Curley further notes that Trooper Drayton, who had Klem in his line of vision, admitted in his deposition that he

never saw Klem look into the passenger side of the Camry.

The record reflects that the District Court, in conducting its qualified immunity analysis, accepted Klem's claim that "he looked in the car and he did not see the suspect." Ap. at A15. Because the question of whether Klem actually looked in the passenger side window of the Camry is an issue of disputed historical fact relevant to the qualified immunity doctrine's reasonableness inquiry, we conclude that the District Court erred by deciding the issue on its own and not submitting it for resolution by a jury.

### 2. The Confrontation

In deciding whether it would be clear to a reasonable officer that Klem's shooting of Curley was unlawful, we must consider the facts and information available to Klem at the time he discharged his weapon. Klem argues that his decision to shoot Curley was justified largely by Curley's behavior during a period of confrontation between Klem and Curley that lasted about thirty seconds.

Klem states that when he first saw Curley, Curley held his gun pointed directly at him in a three point stance. Klem yelled for Curley to put his gun down, and, according to Klem, Curley lowered his arms but did not drop his gun. Klem alleges, that Curley then began to peddle back towards another vehicle, the Pathfinder, which Klem assumed Curley was going to use for cover. According to Klem, Curley gained partial cover behind the Pathfinder and, while still holding his gun, raised his arms at least three times in a threatening manner. Klem claims that he repeatedly shouted to Curley to put the gun down, but, after Curley raised his gun again, Klem finally shot at him, bringing Curley to the ground.

Curley offers a markedly different account of what happened during those pivotal thirty seconds. Most notably, Curley claims that he did not even see or hear Klem until after he was shot. According to Curley, he was never situated in a three point stance, never pointed his gun at Klem or anyone else, and did not raise his arms up and down in the manner described by Klem. Curley claims that he had run out towards the Camry, suddenly realized he had no cover, and decided to turn back for cover behind the open car door of his police vehicle. However, contrary to Klem's testimony, Curley claims that he had hardly begun moving back for cover before he was shot down by Klem. Curley contends that he was shot while standing halfway between the Pathfinder and the Camry, not while partially behind the Pathfinder as alleged by Klem.

Curley also refers to the testimony of Freader and Mulligan, who both stated that, at the moment of the shooting, they observed Curley's gun to be down by his side, not pointing up toward Klem. Both Drayton and Mulligan testified that they did not see Curley raise his arms up and down as Klem described. None of the witnesses testified that they ever saw Curley positioned in a three point stance.

All of these disputed factual issues bear directly upon the question of what information was available to Klem at the time he decided to shoot Curley. We note that "[t]he standard for granting or denying a motion for summary judgment does not change in the qualified immunity context." See Karnes, 62 F.3d at 494. Viewing the facts in the light most favorable to the plaintiff, a court must determine whether the defendant should prevail as a matter of law. See id.; see also Gruenke, 225 F.3d at 299–300 (observing that "this admittedly fact-intensive analysis must be

conducted by viewing the facts alleged in the light most favorable to the plaintiff").

In this case, the District Court failed to view the facts in the light most favorable to Curley and appears to have overly credited Klem's account of what occurred at the toll plaza. For example, the court noted that, immediately prior to the shooting, Klem perceived that Curley's weapon was raised and pointed at him. Ap. at A15. Curley claims, however, that the gun was down by his side at the moment of the shooting. We find that this and the other disputed facts discussed above should have prevented Klem from prevailing as a matter of law at this stage of the case. A jury must resolve these issues before a court can determine whether it would have been clear to a reasonable officer that Klem's conduct was unlawful.

Thus, we conclude that the District Court could not have properly viewed these unresolved factual issues in the light most favorable to Curley and still find that Klem's conduct was protected under the qualified immunity doctrine.

### B. State Law Claims

Finding that Klem was shielded from liability under the New Jersey Tort Claims Act, the district court also dismissed Curley's state law claims. N.J.Stat.Ann. § 59:5–2 provides, in pertinent part, that a public employee is not liable for any injury caused by "a person resisting arrest or evading arrest" or for any injury "resulting from or caused by a law enforcement officer's pursuit of a person." The district court concluded that this immunity provision was directly on point. On appeal, Curley contends that Klem is not entitled to immunity from liability for the state law claims because actions involving the discharge of police firearms fall outside the ambit of the immunity provisions of the New Jersey Tort Claims Act.

Curley's argument relies upon *Alston v. City of Camden*, 332 N.J.Super. 240, 753 A.2d 171 (2000), *cert. granted*, 165 N.J. 607, 762 A.2d 221 (2000), a case decided by the Appellate Division of the Superior Court of New Jersey.

After the briefs for this appeal had already been filed, however, the New Jersey Supreme Court reversed the Appellate Division, holding that the putative exception created by the Appellate Division for injuries resulting from the use and handling of police firearms was inconsistent with the Tort Claims Act, its legislative history, case law, and subsequent amendments to the Act. *Alston v. City of Camden*, 168 N.J. 170, 773 A.2d 693, 699 (2001).

In light of the New Jersey Supreme Court's recent decision in *Alston*, we find that the District Court correctly concluded that Klem was entitled to immunity from liability for Curley's state tort claims against Klem pursuant to N.J.Stat.Ann. § 59:5–2, and we therefore affirm the dismissal of those claims.

### V.

In conclusion, we will reverse the District Court's grant of defendant's motion for summary judgment and will remand the case for further proceedings consistent with this opinion. We will affirm the court's dismissal of the plaintiff's state law claims against the defendant.