**Denial GIDDINGS, Plaintiff,**

v.

**JOSEPH COLEMAN CENTER, et al., Defendants.**

**Civil Action No. 04–CV–4382.**

United States District Court, E.D. Pennsylvania.

Feb. 7, 2007.

Dennis R. Suplee, Kate A. Kleba, Schnader Harrison Segal And Lewis, L.L.P., Philadelphia, PA, for Plaintiff.

Craig M. Straw, Harry G. Mahoney, Troy D. Sisum, Deasey, Mahoney & Bender Ltd., Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Denial Giddings filed this § 1983 action against Parole Officer Amy Clewell ("Clewell"), Warrant Officer Willie Pullins ("Pullins"), Warrant Officer Deborah McKnight ("McKnight"), the Joseph Coleman Center ("Coleman Center"), and various Coleman Center employees ("Cole-

man Staff"). Defendants Clewell, Pullins and McKnight have moved for summary judgment asserting the defense of qualified immunity. For the reasons stated below, I will grant this motion.[1]

## I. BACKGROUND

### A. *Facts*[2]

In 2002, plaintiff Denial Giddings was serving a 35 month to seven year sentence for criminal trespass at the state correctional institution at Houtzdale ("SCI–Houtzdale"). On September 15, 2002, Giddings was placed on parole and admitted as an inpatient at Self–Help, a halfway house. On April 10, 2003, he was discharged from Self–Help and moved to a private residence with his family. On one of his weekly visits to his parole officer Giddings carried a toy gun with him. Because of the fake weapon, on October 23, 2003 the Pennsylvania Board of Probation and Parole placed Giddings at the Coleman Center, a halfway house in Philadelphia.

The Coleman Center was under contract with the Pennsylvania Department of Corrections to provide housing, food, mental health treatment and employment services to parolees and parole violators. Among other staff, the Coleman Center employed a full-time nurse for treating minor illnesses. Approximately twice a week a psychiatrist was available for mental health treatment. Residents were permitted to leave and reenter the Coleman Center only with specified destinations and permission from a counselor.

Approximately one month later on December 2, 2003, Giddings was in a severely depressed emotional state. As he had done on previous occasions, Giddings expressed his mental health and medication concerns to the Coleman staff. Giddings suffered from a mental or emotional disorder that caused him to cut into the skin of his arms in order to "relieve pressure." On a regular basis, the Coleman Center distributed single razor blades to residents for shaving. Around 4:00 p.m. on that day, three Coleman Staff members found Giddings in his room holding a razor blade to his own arm. Giddings cut his arm and then flushed the razor down the toilet. Giddings alleges that this cutting act was part of a suicide attempt.

Amy Clewell was a parole officer on duty at the Coleman Center that day. She was substituting for Giddings' regular parole officer who was on vacation. Clewell had never met Giddings before that day on December 2, 2003. Clewell was summoned to Giddings' room as the cutting incident was occurring. Her line of sight from the hallway was blocked from clearly seeing events as they transpired inside the room, but she was present when everyone eventually left the room and entered into a common area. Clewell, Giddings and the Coleman Staff members then proceeded to an office in the Coleman Center. Giddings said that he was unhappy at the Coleman Center and wanted to leave. Giddings was asked if he wanted to go to the hospital, and he replied affirmatively.[3] He was

---

**1.** The court has subject matter jurisdiction under 28 U.S.C. § 1331.

**2.** In deciding a motion for summary judgment the facts must be stated in a light most favorable to the non-moving party. Here, the facts will be stated most favorable to Giddings. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). On a summary judgment motion based on qualified immunity, a district court must also specify what if any facts are material and subject to genuine dispute. *Forbes v. Township of Lower Merion,* 313 F.3d 144, 146 (3d Cir.2002).

**3.** At his deposition, Giddings testified as follows:

then told that he would be taken to the hospital the next morning because his regular parole officer was not present.[4] Giddings told those present in the office that he did not want to wait. He finally agreed to stay in the Coleman Center until the next morning, but he attributes this to his unsound mind at the time.[5] Manuel Arroyo, Facility Director of the Coleman Center, suggested that Giddings be transferred to the Harmony Unit, the mental health unit at the Coleman Center. Giddings agreed to the transfer. Because his arm had been bleeding, Giddings had wrapped something tight around it. After the transfer to the Harmony Unit, Giddings was not given any psychiatric treatment and no one made any effort to limit his access to razor blades.

Shortly after the cutting incident on December 2nd, Clewell spoke with her supervisor and they agreed to remove Giddings to a state correctional facility on the basis that he violated his parole by possessing a weapon, namely the razor blade. Clewell was concerned that Giddings could be a threat to others and also believed that Giddings would be able to receive more extensive mental health treatment in prison than at the Coleman Center. But she and her supervisor decided to postpone his removal until the next day because of the lack of available parole agents. Clewell made no arrangements to ensure that Giddings would be supervised or be prevented from having access to other razor blades or sharp objects that evening.

On the morning of December 3, 2003, the day after the incident, Clewell reviewed Giddings' file at the parole office. This file contained a Psychological Report and Clinical Risk Assessment report, which stated that "Mr. Giddings has an extensive history of assaultive and manipulative behavior toward staff. He has feigned suicide attempts for secondary gain...." After reviewing the file, Clewell organized an arrest team of six parole

Q. [A]t any point in time did you ask Agent Clewell for any medical attention?
A. You talking about the parole agent that was there at that time?
Q. The female, yes.
A. The female? Well, she was saying that I could go to the hospital, because they told her what happened, we was all in the office. And because I had—she say, You all right? I said, No, I'm bleeding. I'm still cut. And they ask you—they asked me do I want to go to the hospital. I said, Yeah. They said, Can you wait until tomorrow?
Q. They asked you if you can wait until tomorrow?
A. Yeah.
Q. And what did you say?
A. And I said, No, I don't really want to wait until tomorrow. Then they told me something about your original parole officer ain't in at that time. I said, What that got to do with it? You know, the hospital is still open. You know, they said we'll put you down in Harmony Unit for the night, and you'll go to the hospital in the morning. And the agent was there with them when they say that. So like I say, you know, I just went along what they went along with. And, you know, when I went down the room.
(Giddings Dep. At 26–7).

4. Clewell testified that she "specifically asked [Giddings] if he wanted any medical treatment, and he said—he declined. He said no." (Clewell Dep. at 60–61. See also Commonwealth Employee Witness Statement, Clewell Dep., Exh. 2, pg. 3; 257H Supervision History Report, Clewell Dep., Exh. 3, pg. 2) She does not mention ever telling or asking Giddings to wait until the next day for medical treatment.

5. The parties dispute Giddings' mental state after he cut himself. Giddings testified that he was "not in my right state of mind" and "liable to say anything." (Giddings Dep. at 18) In his complaint, he asserts that he required immediate psychiatric care. On the other hand, Clewell testified that "he seemed pretty calm at that period" (Clewell Dep. at 48) and "everything appeared under control" (Clewell Dep., Ex 2, pg. 4).

officers. She and the officers planned to arrest Giddings in the parole room of the Coleman Center. They covered a window in the parole room so that Giddings could not see who was in the room when he arrived, and thus not suspect that he was about to be arrested.[6]

Giddings was summoned to the parole room without any escort but he never arrived. Instead, as he approached the room from the hallway he noticed a group of people inside and then returned to his own room. When Gidding never arrived, the arrest team went to Giddings' room where he was found facing the wall with a deep, bleeding gash on his forearm, which was the same forearm as the prior day's cut.[7] The officers handcuffed Giddings, brought him back to the parole room and called for the nurse on staff at the Coleman Center. The nurse put a bandage on the gash and said that Giddings would probably need stitches but could be transported first in his present condition to state correctional institute at Graterford ("SCI–Graterford") and be treated there.[8]

Warrant Officers Willie Pullins and Deborah McKnight arrived at the Coleman Center to transport Giddings to SCI–Graterford. Initially Pullins and McKnight were hesitant to transport Giddings in his wounded condition, but the nurse assured them that "he would be fine for transport." Giddings walked to the transport van without aid. But during the trip between the Coleman Center and SCI–Graterford Giddings was drowsy and eventually passed out, fell over and scratched his face on the inside of the van.

Giddings had taken some pills and told McKnight that he felt drugged. During the two-hour long trip, Giddings also pulled the bandage off his arm. Pullins telephoned his supervisor out of concern for Giddings' condition. The supervisor instructed Pullins and McKnight to continue to SCI–Graterford with Giddings. Despite being instructed by the Coleman

6. The sequence of events at the Coleman Center on December 3rd is fairly consistent in the pleadings of all the parties, but contradicted greatly by Giddings' own deposition testimony. Because the version in Giddings' deposition would render much of his complaint illogical, I will present the facts as stated in Giddings' pleading and supported by Clewell's deposition. For example, most of Giddings' claims are premised on liability for failing to prevent Giddings from cutting himself a second time, or making if more likely that he would cut himself a second time. But during his deposition, Giddings repeatedly asserted that he did not cut himself a second time. (Giddings Dep. at 19, 26, 28, 44). If this testimony were taken as true, many of his claims would be moot.

7. Giddings testified in his deposition that on his way to the parole room he remembered that he left a pass in his room, and so he returned to retrieve it. (Giddings Dep. at 25–26, 28). He then proceeded again to the parole room, where the arrest team grabbed him and handcuffed him when he arrived. (Giddings Dep. at 28) He did not testify that they found and arrested him in his own room. Contradictions in a party's own testimony or affidavits cannot form the basis for a genuine dispute of material fact. It goes to the party's credibility, but this is not for the court to weigh on summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Clewell's testimony and written incident reports explain that Giddings was arrested in his room (not the parole room) after Giddings cutting himself a second time. She asserts that the cut on December 3rd was in a different direction than the cut on December 2nd. (Clewell Dep., Exh 2, pg. 5) Moreover, when she asked Giddings what had happened that morning, Giddings replied that he cut himself. (Clewell Dep. at 78–9)

8. Although not directly relevant to his claims, Giddings stated that the nurse did not clean the wound prior to bandaging his arm. (Giddings Dep. at 20) This conflicts with the testimony of Clewell and McKnight, who both recalled that the nurse cleaned the wound before wrapping it. (Clewell Dep., Exh. 2, pg. 5; McKnight Dep. at 44, 60).

Center nurse not to make any stops en route to SCI–Graterford, the officers stopped at the Philadelphia Northwest District parole office for approximately 10 to 60 minutes to pick up some records.[9] The officers did not stop to take Giddings to a hospital for medical treatment.[10]

When they arrived at SCI–Graterford, Giddings was unconscious and put in a stretcher. A nurse at the penitentiary told Officer Pullins that he could get in trouble for bringing Giddings to the hospital in his condition.[11] But because Giddings needed medical attention, she agreed to admit him after taking photos of his injuries. Giddings was then given stitches and placed in a mental health unit at the prison.

### B. Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56(c), a District Court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A disputed fact is material if, under the substantive law, it might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When qualified immunity is asserted summary judgment motions present two counterbalancing considerations. "[T]he Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation, because [if] a case is erroneously permitted to go to trial, then qualified immunity is effectively lost. A decision on qualified immunity, however, will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir.2005) (quoting *Curley v. Klem*, 298 F.3d 271, 277–78 (3d Cir.2002)) (internal quotations omitted).

## II. SECTION 1983 ACTIONS AND QUALIFIED IMMUNITY

A plaintiff who brings a claim under 42 U.S.C. § 1983 must show that (1) the challenged conduct was committed by a person acting under the color of state law; and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or federal law. The moving defendants indisputably acted "under color of state law" at the time in question because they were either parole officers or warrant officers enforcing Pennsylvania law. As for the second prong, that must be considered in conjunction with the first step of the qualified immunity analysis.

---

9. The reason for stopping is disputed. Giddings recalled that the purpose was to pick up records. (Giddings Dep. at 29–30) Pullins, driver of the transport van, said it was probably to pick up another prisoner. (Pullins Dep. at 56–57) McKnight testified that she and Pullins may have discussed the possibility of transferring Giddings to the custody of another agent for transfer. (McKnight Dep. at 75–77).

10. Pullins testified that it was common practice for the warrant officers to make stops to pick up additional parole violators or allow passengers to go to the bathroom, but not common practice to stop for medical treatment of passengers.

11. Both Pullins and McKnight contradict this testimony. They claimed that upon arrival at SCI–Graterford, Giddings was fully-conscious and walked into admissions without assistance. (McKnight Dep. at 87, 91; Pullins Dep. at 63, 77).

■ Qualified immunity is an affirmative defense to Section 1983 claims requiring a two-step analysis. *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir.2002). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [state official's] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If this threshold question, which is also the second prong of Section 1983 analysis, is answered in the negative then the court must rule for the state official. If a constitutional violation is found, the second inquiry of qualified immunity is whether the right allegedly violated was clearly established enough that it "would be clear to a reasonable [state official] that his conduct was unlawful in the situation he confronted"? *Id.* at 201–2, 121 S.Ct. 2151.

### A. *Applicable Constitutional Protections*

Again, the first consideration is whether the defendants violated plaintiff's constitutional rights. Giddings claims that defendants violated his rights stemming from the Eighth and Fourteenth Amendments. Specifically, Giddings accuses all three defendants of being deliberately indifferent to his serious physical and mental health needs in violation of the 8th and 14th Amendment (Amended Complaint, Counts II and III). Additionally, Giddings claims that Clewell violated the Due Process Clause of the Fourteenth Amendment in two ways: 1) under the state-created danger doctrine, she illegally created a danger by increasing Giddings' vulnerability to self-inflicted harm and then failing to protect him from this harm (Amended Complaint, Count IV); and 2) under the "special relationships" doctrine, she failed to perform her affirmative duty to protect Giddings from his known vulnerability to self-inflicted injury (Amended Complaint, Counts VI).

■ The Eighth Amendment's prohibition against deliberate indifference is the only constitutional standard applicable to Giddings' claims.[12] Giddings was confined to the Coleman Center by the Pennsylvania Board of Probation and Parole and completely dependant on the Center for all of his basic needs. His status was akin to that of a convicted person punished by incarceration. *See Samson v. California*, —— U.S. ——, ——, 126 S.Ct. 2193, 2198, 165 L.Ed.2d 250 (2006) (holding that "parolees are on the 'continuum' of state-imposed punishments"); *Morrissey v. Brewer*, 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (holding that "parole is an established variation on imprisonment of convicted criminals"). Because Giddings was essentially incarcerated and being punished, the Eight Amendment protection from cruel and unusual punishment, which includes protection from deliberate indifference under *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), trumps Fourteenth Amendment due process analysis. *See Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (holding that when convicted prisoners challenge deliberate infliction of pain "the Due Process Clause affords ... no greater protection than does the Cruel and Unusual Punishment Clause"); *Ingraham v. Wright*, 430 U.S. 651, 669, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (finding that Eighth Amendment scrutiny is appropriate following criminal conviction and incarceration); *Sample v. Diecks*, 885 F.2d 1099, 1107–8 (finding that detention of a prisoner beyond his sentenced term of imprisonment is "punishment" under the Eighth Amendment).

---

12. This conclusion makes it unnecessary to consider Giddings' due process claims under the doctrines of state-created danger and "special relationship."

Under the Eighth Amendment standard of deliberate indifference, Giddings had the right to be free from state officials' deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 102–4, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To find deliberate indifference: (1) the defendant prison official must subjectively know of and disregard an excessive risk to the inmate's health or safety; and (2) the inmate's medical needs must be objectively serious. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Beers–Capitol v. Whetzel,* 256 F.3d 120, 133 (3d Cir. 2001).

The first prong of deliberate indifference analysis is satisfied when, for example, an official "(1) knows of prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; (3) prevents a prisoner from receiving needed or recommended medical treatments." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999) (citing *Durmer v. O'Carroll,* 991 F.2d 64, 68 (3d Cir.1993)). *See also Spruill v. Gillis,* 372 F.3d 218, 235 (holding that the first prong is satisfied when prison authorities "deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury") (citations omitted). The standard is subjective because " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Beers–Capitol,* 256 F.3d at 131 (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970). But actual knowledge may be inferred from circumstantial evidence, such as if "the excessive risk was so obvious that the official must have known of the risk." *Id* at 133.

The "seriousness" of a medical need, by contrast, is judged by an objective standard. *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. To qualify as "serious" under the second prong of deliberate indifference,

[t]he detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death. Moreover, the condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.

*Woloszyn v. County of Lawrence,* 396 F.3d 314, 321 (3d Cir.2005) (quoting *Colburn v. Upper Darby,* 946 F.2d 1017, 1023). Seriousness may also be inferred from "the effect of denying the particular treatment" for a prisoner's medical need. *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987). For example, an injury is serious when an inmate suffers, as the result of denied or delayed adequate medical treatment, "unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss." *Id.* at 347 (citations omitted).

### B. *Clear to a Reasonable Officer*

The second prong of the *Saucier* qualified immunity test asks whether the constitutional right violated was clearly established enough at the time of the violation that it "would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"? 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *See also Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ("[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). This question encompasses two components: 1) whether

the right was clearly established, and 2) "whether the officer made a reasonable mistake as to what the law requires" under the circumstances. *Carswell v. Borough of Homestead,* 381 F.3d 235, 242 (3d Cir. 2004). Together, these inquiries are designed to ensure that a state official had sufficient notice that his conduct was unlawful. *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151. Officials may be fairly warned even if the factual circumstances are novel, *Hope v. Pelzer,* 536 U.S. at 741, 122 S.Ct. 2508, but "in the light of pre-existing law the unlawfulness must be apparent," *Wilson v. Layne,* 526 U.S. 603, 614–15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

The second prong of *Saucier* is reached only if it is first determined that Clewell and/or the warrant officers violated a constitutional right under the alleged facts. If the second prong is reached, the moving defendants in this case are liable only if in 2003 the state of the substantive law at issue gave the defendant fair warning that his or her alleged actions were unconstitutional. Giddings' claims against each moving defendant will also be analyzed in this context.

## III. DISCUSSION

### A. *Officer Clewell*

■ Giddings claims that Clewell was deliberately indifferent to both his physical and mental medical needs. As for his physical medical needs, Giddings claims he needed adequate medical treatment for the cut on his arm, and Clewell was deliberately indifferent to this need; as for his mental medical needs, Giddings claims he needed treatment for, and protection from, his self-mutilation disorder. Giddings contends that Clewell was deliberately indifferent to these mental medical needs by 1) not "permitting him to be properly evaluated by a mental health expert" while knowing that he presented a clear substantial risk of harm to himself, and 2) failing

to ensure that Giddings would not have any further access to razors or sharp objects after the December 2nd incident.

### 1. *December 2nd*

I will address the events of December 2nd, first the physical and then the mental medical needs. When construed in Giddings' favor, the evidence of record relating to the events of December 2nd is insufficient to create a genuine issue of material fact that Clewell was deliberately indifferent to Giddings' medical needs under the Eighth Amendment.

The evidence shows both that the cut on Giddings arm was not "serious" and that Clewell was not indifferent to Giddings' physical medical needs by Eighth Amendment standards. The cut was not serious because Giddings did not experience significant blood loss or infection, or even show signs of pain or unconsciousness, necessitating medical attention on that day. After cutting himself, Giddings was conscious and calm enough to follow Clewell and Coleman staff to an office where they all discussed his condition. Furthermore, on the next morning of December 3rd Giddings was capable walking to the parole office without incident and alert enough to see people inside the office and recognize that he was about to be arrested. The result of delayed medical treatment in this case is also negligible; there is no evidence of unnecessary suffering or any risk of permanent disability.

Also establishing that Clewell was not indifferent to the cut, the record reflects that soon after Giddings cut himself Clewell engaged him in conversation and expressed her concern by asking if he wanted to go to the hospital. Although Clewell may have decided not to take Giddings to the hospital immediately, she offered to take him to the hospital the following morning. Giddings agreed to wait until

the next day, if only reluctantly. The next morning Clewell was the one responsible for seeing to it that Giddings was taken to a nearby prison where he would receive, and actually did receive, immediate medical attention. These actions fall far short of the level of delay and denial of necessary treatment required to rise to the level of an Eighth Amendment violation. *See Gerber v. Sweeney*, 292 F.Supp.2d 700, 709 (E.D.Pa.2003) (finding no Eight Amendment violation when prisoner was not given a requested tetanus shot until over two months after he suffered a laceration on his right heel). At most Clewell's decision to wait until the next morning constituted mere negligence, which is not compensable as a constitutional deprivation absent "some more culpable state of mind." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Clewell's decision to delay treatment until December 3rd did not indicate a nefarious intent for Giddings to suffer. *Cf. White v. Napoleon*, 897 F.2d 103, 109 (3d Cir.1990) (finding evidence of intent to inflict pain and continue treatment known to be painful, ineffective or substantially risky sufficient to distinguish claim from ordinary negligence).[13]

█ As for Giddings' mental health needs, the evidence fails to show that these needs were "serious" on December 2nd. While "[a] particular vulnerability to suicide represents a serious medical need," *Woloszyn*, 396 F.3d at 320, a lay person also would not have found it "obvious" that Giddings required immediate mental health counseling following the first time he cut himself on December 2nd. Giddings claims that Clewell must have known that he would likely cut himself again be-

cause she witnessed his self-mutilation and his agitated state. But, as explained above, there is no evidence that Giddings' physical injury was obviously indicative of a genuine suicide attempt. Nor is there evidence that Giddings was particularly agitated: he agreed to go to the Harmony Unit and went there willingly.

Particularly in light of Giddings' history of feigned suicides, "bare assertions, conclusory allegations or suspicions" that Giddings' mental condition posed a serious threat to himself are not enough to show the existence of a genuine issue, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Giddings testified that in this particular instance on December 2nd he attempted to commit suicide. But in his amended complaint and pleadings Giddings contends that he had a disorder causing him to regularly cut himself "to relieve pressure." Furthermore, the only professional psychological evaluation of Giddings in the record, a July 10, 2002 report (approximately one year before the incident in question) reviewed by the Chief of Psychology at SCI–Houtzdale, found that "Mr. Giddings has feigned suicide attempts for secondary gain." (Clewell Dep, Exh. 1). When viewed in the context of the sum of the evidence, Giddings' testimony is insufficient to create a genuine issue of fact about whether his mental condition was "serious."

Clewell also did not exhibit indifference to Giddings' mental needs. Giddings' evidence that Clewell subjectively "knew" that he had a serious mental condition is Clewell's deposition testimony characteriz-

---

13. Giddings also claims that Clewell was deliberately indifferent because he specifically requested to go to the hospital on December 2nd, but Clewell declined on the basis that Giddings' parole officer was not available. A state official may be deliberately indifferent for delaying "necessary medical treatment,"

*Rouse*, 182 F.3d at 197, or denying "reasonable requests for medical treatment," *Spruill*, 372 F.3d at 235. As explained, there is no evidence creating a genuine issue that Giddings needed immediate hospital care or that it was reasonable for him to request to be taken to a hospital immediately.

ing Giddings' behavior as "not normal." But this "not normal" description does not prove knowledge of a serious condition—it could apply just as easily to someone who cut himself for manipulative purposes as someone who was suicidal. Sending Giddings to the Harmony Unit, the mental health unit of the Coleman Center, by itself shows that Clewell was not deliberately indifferent to his mental needs.

Even if the evidence of Giddings' mental condition were sufficient to create a genuine dispute of facts showing a constitutional violation, Clewell is still entitled to qualified immunity under the second prong of the *Saucier* analysis. The general Eighth Amendment principal that prison officials may not be deliberately indifferent to inmates' serious medical needs was clearly established law in 2003. *See Beers–Capitol v. Whetzel,* 256 F.3d 120, 142 (3d Cir. 2001) (finding the doctrine of deliberate indifference to be clearly established law). But the law was not clearly established as to whether a parole officer must be able to determine, based on a single, initial encounter, whether a parolee was actually suicidal, cutting himself only to "relieve pressure," or merely engaging in manipulative behavior. Just because a plaintiff says after the fact that he was trying to commit suicide, does not make it so.

The law was equally unclear which defendant, if any, had an affirmative duty to arrange emergency counseling treatment for resident parolees—the parole officer on duty or the halfway house that contracted with the state to provide for its residents' basic needs and safety. *See e.g. Purkey v. Simmons,* 29 Fed.Appx. 546, 547–548 (10th Cir.2002) (holding that parole officers are not liable for denying repeated requests for drug treatment by parolee who subsequently committed murder while on parole); *Fitzpatrick v. Bergen County Probation Department,* 2005 WL 1126794 (D.N.J.2005) (dismissing parolee's § 1983 claim that state's refusal to permit him to participate in an alcohol rehabilitation program caused his relapse).

As for Giddings' need to be isolated from sharp objects, a reasonable parole officer in Clewell's position could have mistakenly believed that the Coleman Center actually had undertaken the responsibilities of isolating Giddings from sharp objects and providing him with mental health treatment. Immediately following the cutting incident on December 2nd, Clewell was present with other Coleman staff, who had also witnessed plaintiff cut himself, when it was decided to transfer Giddings to the Harmony Unit of the Center. As Clewell knew, the Harmony Unit was a mental health unit. A reasonable parole officer could legitimately presume that the mental health unit of the halfway house would isolate residents known to have self-mutilating tendencies from razors and other sharp objects, as well as provide immediate counseling to residents exhibiting suicidal tendencies.

### 2. *December 3rd*

■ Clewell was also not deliberately indifferent to Giddings' physical and mental needs on December 3rd, the second day Giddings cut himself. It is undisputed that on that day, upon arresting Giddings and seeing the cut on his arm, Clewell and the other agents summoned the Coleman Center's nurse on duty to treat it. (Giddings Dep. at 29; Clewell Dep. at 80). Though Giddings disputes whether the nurse "adequately" treated the wound, mere allegations of medical malpractice or disagreement as to proper treatment do not satisfy the first prong. *Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir.2004); *Monmouth County* at 346. Furthermore, on that day Clewell was not indifferent to Giddings' mental health; she immediately sent Giddings, under the supervision of

experienced warrant officers, to a prison that she believed to offer better and faster mental health treatment than the Coleman Center.[14]

### B. *Officers Pullins and McKnight*

■ Giddings claims that Officers Pullins and McKnight were deliberately indifferent to his serious medical needs in two ways: 1) by not stopping en route to SCI–Graterford to take Giddings to a hospital for medical treatment, and 2) by making a stop for other non-medical reasons.

The officers were not deliberately indifferent by failing to take Giddings to a hospital. The record is replete with evidence that both warrant officers repeatedly asked the Coleman Center nurse if Giddings could be transported to SCI–Graterford in his condition, and the nurse repeatedly told them that Giddings was stable enough for transport. (See e.g. Clewell Dep. at 89–90) "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir.2004). *See also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir.1993) (affirming summary judgment for two non-physician prison officials who failed to respond to the medical complaints of a prisoner who was already being treated by a doctor). Pullins and McKnight were entitled to rely on the nurse's professional opinion.

As to the warrant officers' decision to stop for non-medical reasons en route to SCI–Graterford, Giddings claims that this was deliberately indifferent because the Coleman Center nurse explicitly gave the officers instructions to not make any stops in consideration of Giddings' medical condition. The only evidence presented to support this assertion is Clewell's deposition testimony that it was her "understanding" that Giddings would be transported directly to SCI–Graterford without any stops. (Clewell Dep. at 81). Clewell never said that the nurse gave an explicit order. Neither of the warrant officers nor Giddings testified that the nurse ever gave such instructions. "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Clewell was not involved in transporting Giddings, so her "understanding" of this endeavor is too weak to form a genuine issue whether the parole officers failed to comply with instructions not to stop in violation of the Eight Amendment.

### IV. CONCLUSION

Public officials have a privilege of qualified immunity to "protect them from undue interference with their duties and from potentially disabling threats of liability." *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir.2005) (quoting *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994)). Based on a review of the pleadings, depositions and

---

**14.** In his amended complaint, Giddings seems to suggest that Clewell was deliberately indifferent in sending Giddings back to prison because it caused or contributed to Giddings cutting himself a second time by raising his anxiety level. This argument overlooks the precautions that Clewell and the arresting party took to prevent Giddings from learning of his impending arrest, such as covering the window so that Giddings could not see who was in the parole room. The argument also disregards other considerations Clewell faced in her decision, such as enforcing parole rules and the safety of other Coleman Center residents and staff members.

exhibits in the record, defendants Clewell, Pullins and McKnight are entitled to this protection because there are no genuine issued of disputed material fact that would lead to a finding that they were deliberately indifferent to Giddings' serious medical needs. The motion for summary judgment will be granted.

## ORDER

**AND NOW,** this *7TH* day of February, 2007, it is **ORDERED** that defendants' motion for summary judgment (Doc. # 52) is **GRANTED.**